The following constitutes the
Memorandum Decision of the Court.
Signed November 21, 2016

_____

Roger L. Efremsky
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re CFB LIQUIDATING CORPORATION, f/k/a CHICAGO FIRE BRICK CO., an Illinois Corporation, et al., | Case No. 01-45483 rle Chapter 11 Jointly Administered |
| Debtors. | |
| BARRY A. CHATZ, AS TRUSTEE FOR THE CFB/WFB LIQUIDATING TRUST, | Adversary No. 15-4136 |
| Plaintiff, | |
| v. | |
| CONTINENTAL CASUALTY COMPANY, | |
| Defendant. | |

MEMORANDUM DECISION ON CONTINENTAL CASUALTY COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

-1-

## I. Introduction

On March 9, 2016, Barry Chatz, as trustee for the CFB/WFB Liquidating Trust (the "Trustee" and the "Trust"), filed his First Amended Complaint against Continental Casualty Company ("Continental"). The First Amended Complaint seeks damages for breach of contract and declaratory relief regarding the interpretation of the Joint Chapter 11 Plan of debtors CFB Liquidating Corporation and WFB Liquidating Corporation (the "Plan" and "Debtors"). Continental filed its Answer and a Counterclaim in which Continental also seeks declaratory relief regarding the interpretation of the Plan.[1]

On May 31, 2016, Continental filed its motion for partial summary judgment on its Counterclaim (the "Summary Judgment Motion"). The Summary Judgment Motion has been fully briefed. For the reasons explained here, the Summary Judgment Motion is denied because Continental's interpretation of the relevant sections of the Plan is incorrect.

## II. Background

### a. Background Regarding the Chapter 11 Case

Debtors manufactured and distributed refractory products some of which contained asbestos. As of the October 2001 petition date, Debtors were defendants in numerous personal injury and

---

[1] Continental states in its Counterclaim that its claims for relief are non-core and it does not consent to the entry of final orders by this court. AP Docket no. 19, ¶4. On the contrary, this adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A). In re Pegasus Gold Corp., 394 F.3d 1189 (9th Cir. 2005); In re Wilshire Courtyard, 729 F.3d 1279 (9th Cir. 2013); Plan, §15.4.

-2-

wrongful death lawsuits in which over 22,000 individuals asserted asbestos personal injury claims against Debtors and their affiliates. Main Case Docket no. 422, p. 7 (June 1, 2012 Disclosure Statement).

Debtors had purchased third party liability insurance policies from a number of insurers. When they filed their chapter 11 cases, Debtors had not yet exhausted their primary and excess insurance policies with coverage periods between November 25, 1959 and January 1, 1987 and these insurance policies were the main assets of the estate. Disclosure Statement, p. 8-9.

During the case, Debtors negotiated "buyback" settlements with three of their primary insurance carriers (Hartford Accident and Indemnity Company, Bituminous Casualty Corporation, and ACE Insurance Company) (the Settlements, Settlement Agreements, and the Settling Insurers). The Debtors obtained approximately $11.5 million from these three Settlements. Debtors did not reach a "buyback" settlement with Continental, their only other primary insurance carrier.[2] Disclosure Statement, p. 9-10.

### b. Background Regarding the Plan

Debtors' Plan was filed in June 2012 and confirmed in September 2012. Main Case Docket no. 421 (the Plan), Docket no. 460 (Confirmation Order). Sections 9.1-9.3 of the Plan incorporated the Settlements. Section 8.1 of the Plan described the liquidating trust to which the Settlement proceeds were transferred and through which allowed asbestos personal injury

---

[2] Debtors also negotiated a similar settlement with their excess insurance carrier Safety National Company.

-3-

claims, designated as Class 3 and Class 4 (the "Claims"), were to be paid in accordance with the trust distribution procedures (the "Trust Distribution Procedures") which were also incorporated into the Plan.

Pursuant to the Settlements, Debtors sold their policies to the Settling Insurers free and clear of any liens, claims, interests, and encumbrances under Bankruptcy Code §363, with any such liens, claims, interests, and encumbrances attaching to the Settlement proceeds with the same priority and validity as they held previously. In exchange, the Settling Insurers were granted certain injunctive relief and releases. Plan, §7.3, §7.7, §9. Each of the Settling Insurers paid in an amount that exceeded its policy limits which were then "preserved for the exclusive benefit" of the holders of asbestos personal injury claims. Plan §9.1-9.3. Each Settlement Agreement provides, *inter alia*, that the payment that the Settling Insurer made is the total it is obligated to pay on account of any and all claims relating to its policies, and that all "limits of liability are deemed fully and properly exhausted." Disclosure Statement, Ex. B, C, D.

**c. Treatment of Continental in the Plan**

The Plan also incorporated agreed upon treatment of Continental's insurance obligations. Section 8.3 is entitled "Handling of Claims for which Continental May Have Financial Responsibility." This section is the focus of the dispute in this Summary Judgment Motion and will be discussed in detail below. In short, it (1) provides that the Trust will give Continental a proposal for the payment of the liquidated value of the Claims the Trust contends Continental is responsible for (the

-4-

"Proposals"); (2) provides a structure and deadlines for
Continental to accept or reject any such Proposals; and (3) sets
out the consequences that flow from Continental's response to a
Proposal. Plan, §8.3.

Section 16.19 of the Plan is entitled "Insurance
Neutrality." It provides, in brief, that nothing in the Plan, the
Trust Distribution Procedures, or any Settlement Agreement shall
impair an insurer's rights, Debtors' rights, and/or the Trust's
rights against the Settling Insurers except to the extent
impaired or limited in a Settlement Agreement and/or as expressly
provided in §7.3 of the Plan. Plan, §16.19.[3]

**d. Background Regarding Continental's Insurance Policies**

Continental sold Debtors three primary-level comprehensive
general liability insurance policies which covered asbestos
personal injuries occurring from January 1, 1985 to January 1,
1988. Each policy provided $1 million in coverage. Approximately
$2.56 million in coverage under these three policies remained
available for payment of the Claims when the Plan was confirmed.
AP Docket no. 19, ¶5.

The Trust attached copies of three Continental policies to
the first amended complaint. AP Docket no. 15, Ex. A-C. These
copies of the policies were missing pages, included duplicate
pages, and were, in part, illegible. The court requested complete
legible, copies. On September 23, 2016, the parties filed a joint
stipulation which attached revised versions of the three policies
to be substituted for the original exhibits. AP Docket no. 40,

---

[3] The Plan is also governed by Illinois law. Plan, §16.14.

-5-

Ex. 1-3. The stipulation states that the parties believe that "certain pages of the insuring agreements of the policies may be missing." The court notes that there are, in fact, missing pages but whether the missing pages are only the referenced pages of the "insuring agreements" is unknown.[4]

With respect to bodily injury liability, the record versions of the 1985 and 1986 policies state: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury...to which this insurance applies, caused by an occurrence..." AP Docket no. 40, Ex. 1, Ex. 2. The record version of the 1987 policy does not include this language as it consists of seven almost completely illegible pages. AP Docket no. 40, Ex. 3.

The record version of the 1986 policy includes a page defining bodily injury as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." AP Docket no. 40, Ex. 2, p. 18.[5] The record versions of the 1985 and 1987

---

[4] An insurance company is presumed to know the contents of its own policies. Home Ins. Co. v. Cincinatti Ins. Co., 213 Ill.2d 307, 327 (2004).

[5] In Zurich Ins. Co. v. Raymark Industries, Inc., 118 Ill.2d 23, 45-46 (1987) the Illinois Supreme Court held that (1) an insurer must provide coverage of asbestos-related claims if the claimant suffered bodily injury, sickness or disease during the policy period; (2) bodily injury takes place at or shortly after the time a claimant is exposed to asbestos and continues throughout a claimant's exposure to asbestos; (3) an insurer whose policy is in force at the time a claimant is exposed to asbestos must provide coverage of that claim; and (4) each carrier whose policy is triggered is jointly and severally liable for the total indemnity and defense costs of a claim without

-6-

policies do not include pages with this language. The record version of the 1986 policy includes a page with an "other insurance" provision which the record versions of the 1985 and 1987 policies lack. Nevertheless, Continental claims this provision is in all its policies. AP Docket no. 27, p. 23.

### e. Status of Allowed Asbestos Personal Injury Claims

As a result of the Settlements, plus the payment from Debtors' insolvent insurer Home Insurance Company, and the settlement with its excess insurer Safety National, the Trust initially had approximately $16 million to pay Claims according to the Plan and the Trust Distribution Procedures (the "Insurance Fund").

The Trust Distribution Procedures establish a detailed process for the submission and review of Claims and set forth the requirements for proof of exposure to asbestos and illness.[6] The liquidated value of each Claim is determined pursuant to these procedures and the holder of a Claim is entitled to receive a *pro rata* share of that liquidated value based on the amount in the Insurance Fund. The Trust Distribution Procedures establish four disease levels and a set value for each one: $40,000 for mesothelioma; $10,000 for lung cancer; $10,000 for certain other

---

proration, i.e., must pay all sums. For this case, this holding means a person working for one of the Debtors who was exposed to asbestos in 1985 suffered bodily injury at that time and Continental's obligation to pay all sums under its policies would thus be triggered. See also, John Crane, Inc. v. Admiral Ins. Co., 991 N.E. 2d 474 (2013) (following Raymark).

[6] The claim form requires significant detail. Main Case Docket no. 482, Ex. B (Amended Trust Distribution Procedures).

-7-

cancers; and $2,000 for asbestosis/pleural disease. Main Case Docket no. 482.

In 2013, the Trust began to review Claims. In October 2015, the Trust filed a motion for entry of an order approving and allowing Claims which the court granted (the "Allowance Motion" and the "Allowed Claims"). Main Case Docket nos. 533, 543. The Allowance Motion stated that the Trust had received almost 28,000 Claims for review and had determined that approximately 14,000 Claims with a liquidated value of $46 million satisfied the Trust Distribution Procedures' requirements for allowance. The Allowance Motion stated that the Trust was holding over $14 million from which to make *pro rata* distributions on the Allowed Claims. Finally, because of anticipated litigation with Continental, the Trust proposed to distribute 20% of the liquidated value of the Allowed Claims (roughly $9.2 million) and reserve the rest until Continental's obligations were resolved. Main Case Docket no. 533.[7]

**f. Status of Claims Submitted to Continental**

Between May and September 2015, the Trust submitted Proposals to Continental regarding the payment of Allowed Claims that triggered Continental's policies as §8.3 of the Plan provides. AP Docket no. 15, Ex. D, E, H, I. In each of these Proposals, the Trust contended that Continental's allocated

---

[7] The Trust's Sur-Reply to the Summary Judgment Motion states that the Trust has disbursed $7 million through the 20% *pro rata* payment and still holds approximately $7.18 million, including over $4 million remaining from the total Settlement proceeds. AP Docket no. 35, p. 6. The Trust's Post-Confirmation Operating Report for Quarter Ending September 30, 2016 states it now has a cash balance of $6.6 million. Main Case Docket no. 551.

-8-

percentage of the liquidated value of each Claim was 100% of the liquidated value of each Claim.[8]

According to Continental's Summary Judgment Motion and the Trust's Opposition, the Trust has submitted Proposals to Continental covering 1,133 Allowed Claims with a liquidated value of $7.9 million (the "Tendered Claims"). AP Docket no. 27, p. 11; AP Docket no. 32, p. 16. In addition, the Trust's Opposition states that there are 12,365 Allowed Claims with a liquidated value of $38.1 million which the Trust has not tendered to Continental (the "Non-Tendered Claims") and among the Non-Tendered Claims, 1,037 Allowed Claims, with a liquidated value of $14.9 million, involve occupational exposure to asbestos prior to the start of the coverage period for Continental's policies, i.e., before January 1, 1985. AP Docket no. 32, p. 16.

**III. Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure, applicable here by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." At the summary judgment stage, the court's function is not to weigh evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Fed.R.Bankr.P. 7056; _Celotex Corp. v. Catrett_, 477 U.S. 317, 322–23 (1986).

Continental's counterclaim seeks a declaratory judgment

---

[8] The Trust continued to submit Proposals for the payment of Tendered Claims after it filed this Adversary Proceeding. AP Docket no. 32, p. 16.

-9-

under 28 U.S.C. §2201 regarding interpretation of certain provisions of the Plan.

The court has discretion to grant declaratory relief in appropriate circumstances such as this one. U.S. v. State of Wash., 759 F.2d 1353, 1357 (9th Cir. 1985) (noting declaratory relief should be denied when it will neither serve a useful purpose in clarifying or settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties).

Neither party claims that there are disputed facts and neither claims the Plan is ambiguous. Nevertheless, Continental suggests that if the court finds the Plan is ambiguous, Continental will provide extrinsic evidence that will support its version of the drafting intent of §8.3 and the related Plan provisions. This will not be necessary and §16.11 of the Plan[9] precludes it as does Illinois law. See Air Safety, Inc. v. Teachers Realty Corp., 185 Ill.2d 457, 462 (1999) (stating if language of contract is facially unambiguous, contract is interpreted as a matter of law without parol evidence).

### a. Continental's Summary Judgment Argument

Continental's Counterclaim seeks a declaratory judgment regarding the interpretation of §8.3 of the Plan. Specifically, by this Summary Judgment Motion, Continental wants the court to find:

a) The Trust is "required" as a "condition precedent to

---

[9] The Plan provides that parol evidence is not admissible in an action regarding the Plan or any of its provisions. Plan, §16.11.

-10-

recovering against Continental with respect to any trust claim," to tender to Continental...the allocated percentage of that liquidated value for which the liquidating trust contends Continental is responsible;

b) That [the phrase] "allocated percentage" in §8.3 of the Plan does not permit the Trust to seek the full liquidated value from Continental without allocating a percentage also to the trust fund received from other primary insurers;

c) Continental owes no recovery to the Trust with respect to any Trust Claim absent an allocated percentage proposed to Continental;

d) The Trustee did not comply with the above referenced tender requirements set forth in §8.3 of the Plan.

AP Docket no. 27, AP Docket no. 19, ¶18.[10]

The thrust of Continental's summary judgment argument is that by proposing an "allocated percentage" of 100% of the liquidated value of the Tendered Claims, the Trust is trying to hold Continental liable for more than its fair share of each Tendered Claim. Continental argues that the Trust has to assign to Continental only that portion of each Tendered Claim for which Continental would have financial responsibility under a *post hoc* equitable contribution action. AP Docket no. 27, p. 15. Continental contends that the precise allocation method is not yet at issue but, somewhat inconsistently, also contends that the Trust had to perform an equitable contribution analysis for each Tendered Claim and make an allocation based on it in any Proposal sent to Continental. AP Docket no. 34, p. 16. Accordingly,

_____

[10] Paragraph 18 of the Counterclaim continues with subparagraphs (e)-(g) addressing issues beyond this Summary Judgment Motion.

-11-

because the Trust's Proposals with an "allocated percentage" of 100% are, in Continental's view, invalid, Continental's 90-day time period to respond under §8.3 of the Plan has not begun to run. AP Docket no. 27.

**b. The Trust's Summary Judgment Argument**

The Trust argues that the language of §8.3 of the Plan is clear. It simply provides that the Trust is to make a Proposal to Continental stating the allocated percentage of the liquidated value of the Tendered Claims that the Trust *contends* is appropriate; it does not preclude the Trust from contending that Continental's allocated percentage is 100% of the liquidated value of the Tendered Claims. AP Docket no. 32.

The Trust also argues that, while the language of §8.3 does not require its Proposals to allocate as Continental insists, there is in fact no basis for equitable contribution because there is no unjust enrichment of the sort equitable contribution is designed to ameliorate. The Trust explains that when the Plan was confirmed, the number and the value of the Claims that would be allowed was unknown and whether any Allowed Claims would ever trigger Continental's policies was also unknown. Now, on the other hand, there are Allowed Claims with a liquidated value of $46 million and the Insurance Fund initially held $16 million from which to make *pro rata* payments on these Allowed Claims. The Trust points out that the $7.9 million in Tendered Claims fully exhaust the $2.56 million available under Continental's policies

-12-

under any conceivable allocation method.[11] Based on this, the Trust asserts there is no unjust enrichment to the Trust from an allocated percentage of 100% on the Tendered Claims. Accordingly, Continental was required to accept or reject the Trust's Proposals as the Plan provides.[12] AP Docket no. 32, no. 35.

**IV. Discussion**

    **a. Interpretation of the Plan**

    A chapter 11 plan is a contract to which general rules of contract interpretation apply. In re Bartleson, 253 B.R. 75, 79 (9th Cir. BAP 2000) (citing Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993)). Under Illinois law, the basic rules of contract interpretation are well settled. The primary objective is to give effect to the intention of the parties and a court will look first to the language of the contract to determine the parties' intent; a contract must be construed as a whole, viewing each provision in light of the other provisions; the parties' intent is not determined by viewing a clause or provision in isolation. Thompson v. Gordon, 241 Ill.2d 428, 441 (2011) (citing Gallagher v. Lenart, 226 Ill.2d 208, 232 (2007)). When parties agree to and insert

---

[11] The Trust asserts that (1) a "time on the risk" allocation method would impose at least a 10.7% liability on Continental based on its three years of coverage so its share of the Allowed Claims would exceed its $2.56 million policy limits by at least $1.5 million; (2) a *pro rata* by limits allocation method would impose a liability of 18% of the policies issued by the solvent insurers which also exceeds Continental's policy limits. AP Docket no. 35, p. 7.

[12] The Trust also argues that Continental's interpretation amounts to an effort to modify the Plan which Bankruptcy Code §1127 and §1141 preclude. AP Docket nos. 32 and 35.

-13-

language in a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect. Id. at 442 (citing <u>Fidelity National Title Ins. Co. of New York v. Westhaven Properties Partnership</u>, 386 Ill.App.3d 201, 215 (2007)).

Where a technical term in a contract does not have a commonly understood meaning, it is to be given its technical meaning. <u>Loeffel Steel Products, Inc. v. Delta Brands, Inc.</u>, 379 F.Supp.2d 968, 976 (N.D.Ill. 2005) (citing Restatement (Second) of Contracts §202(3)(b)(1981)).

**b. Section 8.3 of the Plan**

Section 8.3 of the Plan begins by stating that it modifies and supplements the Trust Distribution Procedures and controls with respect to "the handling of Claims or an allocated portion thereof, for which the Liquidating Trust contends that Continental may have financial responsibility." It then states, in relevant part:

> The Liquidating Trust, as a condition precedent to recovering against Continental with respect to any Trust Claim, shall be required *to tender to Continental* in writing, a copy of the Proof of Claim ... along with any supporting materials, along with a *Notice indicating the liquidated value of the Claim*, as determined by the Liquidating Trust, *and the allocated percentage of the liquidated value* for which the Liquidating *Trust contends Continental is responsible.*

Plan, §8.3 (emphasis added).

Section 8.3 limits the number of Claims that may be submitted to Continental to 660 in any quarter and 2,500 in any calendar year. The section gives Continental 90 days to inform the Trust whether it accepts or rejects the terms of any Proposal and describes what the Trust may do if Continental rejects a

-14-

Proposal: the Trust may pay the Claim and then recover from Continental.

Continental argues that the phrase "allocated percentage" in §8.3 of the Plan must be given a technical, insurance-specific meaning which necessarily excludes an allocated percentage of 100%. Based on this interpretation, Continental declined to respond to any Tendered Claim on its merits. The court disagrees with Continental's interpretation; it is contrary to the plain and obvious meaning of the language in §8.3.

First, "allocate" is a word with a commonly understood meaning; it is not a technical term. As used here, it simply means to assign. The question before the court also concerns use of the phrase "allocated percentage" in the Plan, not in an insurance policy. Second, giving "allocate" an insurance-specific meaning - if there is one - does not lead to the conclusion Continental urges. See Caterpillar v. Century Indemnity Co., 2007 WL 7947740 (Ill. App.3d Feb. 2, 2007), at *4 (applying Illinois law, court finds that insurance policy language dictates an "all sums allocation" of defense costs, not a "*pro rata* allocation;" court notes "all sums allocation" is the controlling law in Illinois under Raymark). Accordingly, an "allocated percentage of 100%" of the liquidated value of an Allowed Claim is no different than an "all sums allocation."

Third, use of the word "tender" in §8.3 does not show that an insurance-specific meaning must be given to the word "allocate." As it is used in §8.3 of the Plan, "tender" simply means the Trust will present a Proposal for the payment of certain Allowed Claims - based on the Trust's contention as to

-15-

the proper amount Continental must pay. The word "tender" in §8.3 does not have a technical meaning which it might have in another context, i.e., a coverage dispute. See American Nat'l Fire Ins. Co. v. Nat'l Union Fire Ins. Co., 343 Ill.App.3d 93, 97 (2003) (discussing targeted tender doctrine under Illinois law). Here "tender" simply means the Trust will give Continental a Proposal stating the Trust's contention regarding Continental's financial responsibility to pay the Tendered Claims.

Based on the foregoing, the Trust's interpretation of §8.3 is the appropriate one. An "allocated percentage of 100%" **is** an allocation. Continental had an obligation to respond to the Trust's Proposals regarding the Tendered Claims as provided by §8.3 of the Plan.

### c. Equitable Contribution

The parties agree that under Zurich Ins. Co. v. Raymark Industries, Inc., 118 Ill.2d. 23 (1987), each primary insurer is jointly and severally liable to pay "all sums" on covered claims that trigger its policies. Continental argues that §8.3 of the Plan abrogates this rule and requires the Trust to perform a theoretical equitable contribution calculation for each Tendered Claim and its Proposals must necessarily employ some such allocation method – but excluding 100% – before Continental has any responsibility to respond to any Tendered Claim.

In insurance law, "the right to contribution is an equitable principle arising among co-insurers which permits one who has paid the entire loss to receive reimbursement from another insurer liable for the loss." Royal Globe v. Aetna, 82 Ill.App.3d 1003, 1005 (1980) (finding claim for declaratory relief for

-16-

contribution stated). Equitable contribution applies to policies that insure the same entities, the same interests, and the same risks. Id. These three elements must be met before the insurance can be considered concurrent or double. Home Ins. Co. v. Cincinnati Ins. Co., 213 Ill.2d 307, 316 (2004) (citing Royal Globe and Couch on Insurance 3d §218.3 (rev. 2004)). In order for a settling insurer to recover from another insurer under an equitable contribution theory, the settling insurer must prove (1) all facts necessary to the claimant's recovery against the insured; (2) the reasonableness of the amount paid to the insured; and (3) an identity between the policies as to parties and insurable interests and risks. Schal Bovis, Inc. v. Casualty Ins. Co., 315 Ill.App.3d 353, 362 (citing Royal Globe, noting that excess carriers and primary carriers insure different risks).

### c. Equitable Contribution and Allocation Methods

Continental argues that the "other insurance" clause in its policies supports its entitlement to contribution. AP Docket no. 27, p. 18, AP Docket no. 40, Ex. 2, p. 19. This provision is relevant when Continental's insurance policies and some other insurance policies apply to a loss; the provision requires a reference to the other insurance policies to determine whether "contribution by equal shares" or "contribution by limits" is theoretically involved.[13]

---

[13] See Ins. Co. of North America v. Home and Auto Ins. Co., 256 Ill.App.3d 801, 802 (1993) (describing coverage disputes regarding "other insurance" issues as "a dimly lit underworld where many have lost their way").

-17-

Continental asserts that the Trust is in possession of the policies of the three Settling Insurers and so was required to perform an equitable contribution analysis in advance of making a Proposal for the payment of each Tendered Claim using some unspecified allocation method based on these other policies and the facts of each Tendered Claim.[14]

In an action by a settling insurer seeking equitable contribution from another insurer, the burden is on the insurer seeking contribution to prove the requisite factual predicates for it. Cincinnati Ins. Co. v. Boller Const., Inc., 2006 WL 695459, *18 (N.D.Ill. 2006). Continental equates the Trust to this theoretical settling insurer and posits that the Trust must perform an equitable contribution calculation for Continental's benefit because the Trust is holding the Insurance Fund created by the sale of the Settling Insurers' policies, and in effect, stands in their shoes.

Section 8.3 does not impose this burden on the Trust for the benefit of Continental. The language of §8.3 gives the Trust flexibility; it allows the Trust to state its contention regarding the allocated percentage Continental must pay. When it

_____

[14] The Trust points out that Continental has failed to ask for the Settling Insurers' policies and has repeatedly failed to state an allocation method it finds acceptable. AP Docket no. 35, p. 9, no. 36, ¶21. In its Counterclaim, Continental alleges that it will ask the court to specify the proper allocation method, "e.g., by time on the risk, limits [sic], equal shares, time multiplied by limits, or some other equitable method" *after* the parties have presented arguments, authorities, and evidence. AP Docket no. 19, ¶21. This suggests Continental would have responded to any Proposal that had used an allocated percentage of less than 100% in the same obstructionist fashion it has used in response to the Proposals.

Case: 15-04136   Doc# 44   Filed: 11/21/16   Entered: 11/21/16 16:36:12   Page 18 of 24

negotiated the terms of the Plan, Continental was well aware of the terms of the Settlements and their effect on Continental's equitable contribution rights.[15] Continental could have insisted on language in the Plan that achieved the goal it now seeks. It failed to do so. The Plan will not be rewritten now to achieve this end.

### d. Unjust Enrichment

Continental argues that use of an allocated percentage of 100% creates unjust enrichment to the Trust which equitable contribution is designed to correct. For several reasons, Continental's effort to use an equitable doctrine offends the equitable principles in play here. Continental is not being asked to pay more than its fair share.

First, Continental's approach would require the Trust to spread each Tendered Claim among each Settling Insurer's coverage – an undertaking that would seem to delay the closing of this case by many years and at significant administrative expense. To claim that this sort of delay is warranted by an equitable principle is astounding. The delay benefits only Continental and burdens the Trust and its beneficiaries.

---

[15] In November 2009, Continental filed an objection to an early version of Debtors' disclosure statement in which the settlement with two of the Settling Insurers was discussed. Main Case Docket no. 262. At that time, Continental complained that the plan was unconfirmable and "the criteria contained in the Trust Distribution Procedures would permit legions of claimants to recover for claims that could not pass muster under applicable nonbankruptcy law against the bankruptcy estate of a defendant with little or no liability in the tort system. Worse yet, the Plan would permit the Liquidating Trustee to completely usurp the judicial function with further degradations of the payment criteria." Main Case Docket no. 262, p. 8.

Case: 15-04136   Doc# 44   Filed: 11/21/16   Entered: 11/21/16 16:36:12   Page 19 of 24

Second, there are Allowed Claims with a liquidated value of $46 million and the Trust was funded with $16 million, $11.5 million of which came from the Settling Insurers. There are 1,133 Tendered Claims with a liquidated value of $7.9 million and Continental has $2.56 million in available coverage. There are 12,365 Non-Tendered Claims with a liquidated value of $38.1 million. Of these 12,365 Non-Tendered Claims, there are 1,037 claims with a liquidated value of $14.9 million that do not trigger Continental's policies. Standing alone, this $14.9 million group of Non-Tendered Claims exhausts the remaining coverage under the Settling Insurers' policies. Based on this calculation, the Trust determined that under any allocation theory, Continental will be required to pay its $2.56 million in policy limits on the Tendered Claims. Accordingly, the Trust made the prudent decision to refrain from performing what it determined was a pointless and expensive exercise. Section 8.3 does not mandate this and the court will not compel the Trust to undertake it now. There is clearly no threat of unjust enrichment to the Trust, the Settling Insurers, or the holders of the Allowed Claims. Any unjust enrichment would be only Continental's if its approach were employed.

**e. Exhaustion**

Continental concedes that an allocated percentage of 100% is appropriate if the Settling Insurers' policies are exhausted.[16] However, Continental argues that the Settling Insurers' policies

---

[16] Continental also acknowledges that an allocated percentage of 100% is appropriate where a Claim triggers only its policies. AP Docket no. 34, p. 18.

–20–

are not exhausted because the Trust is still holding their policy proceeds in the Insurance Fund. According to Continental, because the holders of Allowed Claims have vested rights in the Insurance Fund, the Trust must perform some sort of allocation analysis to respect Continental's equitable contribution rights.

The Trust argues that the court need not find that the Settling Insurers' policies are exhausted to rule in the Trust's favor on the interpretation of §8.3, but certainly can make this finding on this record. Here, the Settling Insurers each paid more than their policy limits and obtained releases from the estate; these Settlements are equivalent to fully paying their policy limits for the exclusive benefit of the holders of Allowed Claims. The Trust argues that the Settling Insurers have thus completely fulfilled their obligations as insurers and their policies are, in effect, exhausted.

However, under Illinois law, the holders of Allowed Claims may have an interest in the policy proceeds which were transferred to the Trust. See In re Allied Products Corp., 2004 WL 635212, at *6-7 (N.D. Ill. Mar.31, 2004) (finding that for purposes of adequate protection, claimants had an interest in the policies the debtor proposed to sell back to its insurers in a manner that diluted the claimants right to adequate protection). Section 9 of the Plan is in accord with this.

While the existence of the Insurance Fund held by the Trust may suggest that the Settling Insurers' policies are not technically exhausted, this fact alone is insufficient to require the Trust to perform what is ultimately a pointless equitable contribution analysis and propose an allocation that Continental

-21-

may or may not find acceptable. The Plan does not require it, and in fact, specifically permits the Trust to submit Proposals to Continental based on the Trust's contention regarding Continental's obligations.

Continental also argues that the Trust's position makes Continental's obligations equivalent to those of the Settling Insurers under their "buyback" Settlements. This is incorrect. The Settling Insurers each paid more than their policy limits in 2012. Continental has no such obligation and the Trust is not seeking to impose one. The Settling Insurers each performed their obligations under the Settlements as of the effective date of the Plan in 2012. Now, some four years later, Continental is instead asking for a strained interpretation of the Plan that appears designed to prolong the life of the Trust for Continental's benefit, and at the expense of the Trust and the holders of Allowed Claims. It is worth remembering that the Claimants were injured in the 1980's, that this case has been pending since 2001, and imposing further unnecessary delay in compensating the Claimants or their estates is, on these facts, unfair.

**V. Conclusion**

Section 8.3 of the Plan says the Trust is to make a Proposal to Continental of the allocated percentage of the liquidated value of the Claims for which the Trust contends Continental is responsible. An allocated percentage of 100% *is* an allocation. The Trust made Proposals to Continental that conformed to the terms of the Plan and Continental had a duty under the Plan to respond to the Proposals made by the Trust. In addition, the undisputed facts show there is no basis to require an equitable

-22-

contribution analysis because there is no unjust enrichment to the Trust by proceeding in this fashion.

A separate order will be entered conforming to this memorandum decision.

\* \* \* \* \* \* **End of Memorandum Decision** \* \* \* \* \*

1

2   Court Service List:

3

4   No service required.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28