The following constitutes the
Memorandum Decision of the Court.
Signed November 15, 2017

_____
Roger L. Efremsky
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re CFB LIQUIDATING CORPORATION, f/k/a CHICAGO FIRE BRICK CO., an Illinois Corporation, et al.,<br><br>Debtors. | Case No. 01-45483 RLE<br>Chapter 11<br>Jointly Administered |
| BARRY A. CHATZ, AS TRUSTEE FOR THE CFB/WFB LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>CONTINENTAL CASUALTY COMPANY,<br><br>Defendant. | Adversary No. 15-4136 |

**MEMORANDUM DECISION ON TRUSTEE'S MOTION FOR AWARD OF ATTORNEYS' FEES, COSTS, AND PENALTY PURSUANT TO ILLINOIS INSURANCE CODE 215 ILCS 5/155**

I. Introduction

Before the Court is the motion of Barry A. Chatz, the trustee of the CFB/WFB Liquidating Trust (the "Trustee" and the

-1-

"Trust") for an award of fees, costs, interest, and penalty to be assessed against Continental Casualty Company ("Continental") under Illinois Insurance Code 215 ILCS 5/155 for vexatious and unreasonable conduct (the "§155 Motion" and the "§155 Issues").

The §155 Motion has been fully briefed and argued. These are the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. For the reasons explained below, the Court grants the §155 Motion.

**II. Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157(a) and 1334(b). This is a core proceeding within the meaning of 28 U.S.C. §§157(b)(2)(A), (B), (L), and (O).

In the alternative, if it is determined that this is not a core proceeding, the Court finds it is otherwise related to this chapter 11 case and this decision shall be treated as proposed findings of fact and conclusions of law. 28 U.S.C. §157(c); <u>Montana v. Goldin (In re Pegasus Gold Corp.</u>), 394 F.3d 1189, 1194 (9th Cir. 2005) (applying "close nexus" test for post-confirmation "related to" jurisdiction).

The Court also retained jurisdiction to resolve this matter in the Joint Plan of CFB Liquidating Corporation, f/k/a Chicago Fire Brick Company, and WFB Liquidating Corporation, f/k/a Wellsville Fire Brick Company, as modified (the "Plan") and the Order Confirming the Plan (the "Confirmation Order"). Main Case Docket nos. 421, 460.

//

//

//

Case: 15-04136   Doc# 133   Filed: 11/15/17   Entered: 11/16/17 10:09:43   Page 2 of 51

**III. Background**

   **A. The Plan**

     As explained in greater detail in the Court's Summary Judgment Decision issued in November 2016, the Plan was designed to provide a comprehensive mechanism to resolve Asbestos Claims – as defined in the Plan – in an efficient, centralized, and equitable manner. AP Docket no. 44. (The Summary Judgment Decision is incorporated herein by reference.[1])

     The Debtors' settlements with their solvent insurers other than Continental were incorporated into the Plan and these insurers' policy proceeds funded the Trust with approximately $16 million to be used to pay Allowed Asbestos Claims. Main Case Docket no. 421.

     Continental did not enter into the same sort of settlement as the other insurers but agreed to Plan provisions that created a mechanism for Continental to provide its insurance coverage to pay the Asbestos Claims that triggered its Policies (the "Tendered Claims"). Plan, §8.3 ("Handling of Claims for which Continental May Have Financial Responsibility").[2]

     In short, after the Asbestos Claims were allowed pursuant to

---

[1] Capitalized terms used but not defined herein have the same meanings ascribed to them in the Summary Judgment Decision or the Plan. The Memorandum Decision Denying Continental's Motion for Leave to Refile its State Court Complaint Naming the Trustee as Defendant is also incorporated herein by reference. Main Case Docket no. 586.

[2] Continental filed a proof of claim asserting contingent and unliquidated contribution rights. As Continental itself described it, the Plan resolved this proof of claim. AP Docket no. 52, Dec. Frank, Ex. 3 (Continental's August 14, 2015 letter to Trustee).

-3-

the requirements of the Trust Distribution Procedures (the "TDP"), the Plan provided that the Trustee would submit Proposals to Continental stating the liquidated value of each Asbestos Claim for which it contended Continental's Policies provided coverage, including supporting evidence using a Court-approved proof of claim form. The Plan also provided that the Trustee could submit only 660 Claims per quarter and 2,500 per calendar year and Continental had 90 days to respond to a Proposal. During the 90-day period after receipt of a Proposal, Continental could seek additional information from the Trustee or the Claimant, and had to inform the Trustee in writing whether it accepted or rejected the terms of the Proposal. Plan, §8.3. If Continental accepted a Proposal, it agreed to pay its allocated percentage of the liquidated value of the Tendered Claims, or any different amount agreed upon with the Trustee. Plan, §8.3(a). To the extent Continental had coverage defenses, the Plan provided it with a way to assert them. Plan, §8.3(b).

**B. The Tendered Claims and Continental's Response**

Between May 2015 and September 2015, the Trustee submitted four Proposals to Continental covering 249 Claims with a liquidated value sufficient to exhaust Continental's $2.5 million in Policy limits. In each Proposal, the Trustee contended that Continental's allocated percentage was 100% of the liquidated value of the Tendered Claims. The cover letter for each of the Trustee's Proposals stated that:

> [E]ach claim results from repeated exposure to one or more asbestos-containing products for which one of the Debtors has legal responsibility, including exposure during the coverage period of the Continental Policies.

-4-

AP Docket no. 15, Ex. D (Trustee's May 7, 2015 letter to Continental tendering claims); AP Docket no. 52, Dec. Frank, ¶7-12.

Continental's response to these Proposals, and those sent after this litigation commenced, was that they did not constitute Proposals within the meaning of §8.3 of the Plan because 100% was not a permitted allocation unless the evidence showed that the Claimant was exposed to asbestos *exclusively* during Continental's Policy periods:

> You may be expecting us to infer a 100% allocation to Continental for each of the Tendered Claims. If so, then the Letters and their enclosures provide insufficient information from which we can confirm exposure for each holder of one of the Tendered Claims to a Chicago Fire Brick product *exclusively during* periods for which Continental may bear responsibility . . . ."[3]

AP Docket no. 52, Dec. Frank, Ex. 1 (Continental's August 4, 2015 letter to Trustee) (emphasis added).

The pre-litigation correspondence between Continental and the Trustee shows that the Trustee relied on the holding of <u>Zurich Ins. Co. v. Raymark Industries, Inc.</u>, 118 Ill. 2d 23 (1987) that each primary insurer whose policy is triggered is jointly and severally liable and must pay 100% (*i.e.*, "all sums") on covered claims. <u>Zurich</u> holds that coverage under policies with language identical to Continental's is triggered by the occurrence of three conceivable events: (1) exposure to asbestos

---

[3] Continental's Policies were in effect from 1985-1987. By the terms of the TDP, a Claim showing exposure *exclusively* during Continental's Policy periods would not have been an Allowed Claim because the TDP required proof of exposure *before* December 1, 1980. Continental is deemed to know this due to its involvement in the phase of the case that led to confirmation of the Plan and adoption of the TDP.

-5-

during a policy period; (2) manifestation of asbestos-related disease during a policy period; and (3) diagnosis of asbestos-related sickness during a policy period. Id. at 47. The Zurich court concluded that

> [T]he plain language of the policies unambiguously provides that the insurable event which gives rise to the insurer's obligation to provide coverage (i.e., the "trigger of coverage") is not the exposure to conditions, but the resulting "bodily injury." "Bodily Injury," which gives rise to the insurer's duties under the policies, is defined as "bodily injury, sickness or disease."...[T]hese terms must be read as separate and distinct triggers of coverage.

Id. at 44.

While it may seem like an unnecessary detour to review the Zurich decision in this detail, the Court finds it necessary due to Continental's repeated misstatement of controlling law that a Tendered Claim must include evidence that a Claimant suffered a sickness or disease *resulting from exposure during its Policy periods*. See, for example, AP Docket no. 69, Dec. Tittman, ¶5; AP Docket no. 125-2, Dec. Tittman, ¶13, AP Docket no. 125 at 10:4, 24:26-25:3. To be clear, under Zurich, coverage is triggered if a claimant manifests sickness or is diagnosed with disease during Continental's Policy periods. Id. at 45-46. Adding the phrase "*resulting from exposure during its Policy periods*" is an inappropriate gloss on the Policy language and the applicable standard.

In asserting the 100% allocation, the Trustee also relied on the liquidated value of the Allowed Claims ($46 million) and the limited fund from which to pay them (roughly $14 million at that

-6-

time). Main Case Docket nos. 533, 543.[4]

**C. The Adversary Proceeding and Summary Judgment Decision**

When Continental had not responded after the 90 days had run from the Trustee's September 2015 Proposal, the Trustee sued Continental for declaratory relief and $2.5 million in damages for breach of the Plan and breach of Continental's Policies, plus extra-contractual damages under §155. AP Docket no. 15 (First Amended Complaint).

Continental's Answer denied the allegations of the First Amended Complaint and stated eighteen affirmative defenses, many of which raised insurance coverage issues. AP Docket no. 19. Continental also stated a Counterclaim for declaratory relief on the grounds that §8.3 of the Plan precluded a contention that Continental's allocated percentage was 100% of the liquidated value of any Tendered Claim. AP Docket no. 19.

At the first Adversary Proceeding status conference on May 3, 2016, referring to the disputed allocation issue, Continental's counsel stated:

> [If the Court] says that the allocated percentage means 100%, then the case is over, right? Because then that is effectively saying we have to pay everything, and so *we pay everything*.

AP Docket no. 121, Ex. A, Hr'g Tr. (May 3, 2016) at 22:19-23 (emphasis added).

The Trustee's counsel asked the Court to set a trial date, but Continental's counsel urged the Court to instead set a

---

[4] The Trustee has made a partial distribution on Allowed Claims. The Trust now holds $5.3 million and has made cumulative payments of $11.7 million. Main Case Docket no. 609.

Case: 15-04136   Doc# 133   Filed: 11/15/17   Entered: 11/16/17 10:09:43   Page 7 of 51

briefing schedule for a summary judgment motion that he argued would resolve the entire case. Continental prevailed and the Court set a briefing schedule for summary judgment. AP Docket no. 26.

Continental then filed its Motion for Summary Judgment directed at paragraphs 18(a)-(d) of its Counterclaim. AP Docket nos. 27, 34. The Trustee filed Opposition. AP Docket nos. 32-33, 35. The Court issued its Summary Judgment Decision in November 2016, ruling against Continental on its interpretation of the Plan. AP Docket no. 44.[5] The Court concluded, *inter alia*, that (1) Continental's interpretation of the Plan was unreasonable; (2) an allocated percentage of 100% was a permitted allocation; (3) Continental had a duty to respond to the Trustee's Proposals; and (4) there was no basis to require the Trustee to perform an equitable contribution analysis to allocate to another insurer any part of any Tendered Claim as Continental had argued. AP Docket no. 44, at 18-21.

**D. December 2016 Status Conferences**

On December 6, 2016, the Court held a status conference to address the remaining §155 Issues: whether Continental had engaged in vexatious and unreasonable conduct, and the appropriate remedy if the Court found that it had. The Trustee's counsel requested a trial date for the §155 Issues. AP Docket no. 121, Ex. B, Hr'g Tr. (Dec. 6, 2016) at 4:2-8.

Counsel for Continental disagreed, stating there was nothing

---

[5] By the time of the Summary Judgment Decision, there were more than 1,500 Tendered Claims with a liquidated value of more than $8 million. AP Docket no. 44, at 7-9.

Case: 15-04136   Doc# 133   Filed: 11/15/17   Entered: 11/16/17 10:09:43   Page 8 of 51

left to try. Referring to the threshold legal issue and the Summary Judgment Decision, Continental's counsel said:

> You decided that issue adverse to us and we think it did decide the case . . . [O]ur view is that *we're ready to enter judgment* in whatever procedural manner you would like, but I just don't see that there's anything left to try. You know we put up our best argument and we didn't win, but I think the *issue has been decided*.

AP Docket no. 121, Ex. B, Hr'g Tr. (Dec. 6, 2016) at 4:10-20 (emphasis added).

Referring to the Trustee's request for extra-contractual damages under §155, Continental's counsel stated:

> [W]hat you'd need is *you'd have to enter a judgment*, which I think we could do at this time, frankly. I think we could stipulate to enter a judgment because I think *we've lost our breach of contract argument*, but I think that we'd have to enter that judgment and then they'd have to [indecipherable] tax costs, which Illinois allows them to do under certain circumstances.

AP Docket no. 121, Ex. B, Hr'g Tr. (Dec. 6, 2016) at 8:10-19 (emphasis added).

Continental's counsel also suggested the parties ought to "get together and resolve it" but they had not yet had a chance to do that. AP Docket no. 121, Ex. B, Hr'g Tr. (Dec. 6, 2016) at 8:21-9:2. The Court continued the status conference to December 12, 2016 to allow the parties to discuss their next steps.

At the December 12, 2016 status conference, counsel for both parties explained they had agreed to brief whether the Trustee could make the requisite showing for recovery of extra-contractual damages under §155 and the Court did not need to set a trial date. The Trustee's counsel explained that they had agreed that one judgment was appropriate:

> [Continental] isn't going to seek entry of a judgment right now, because we had talked about trying to enter an agreed

–9–

judgment on the insurance part, the coverage part of the case, because we only want one appeal and he doesn't want his time to appeal to run on that.

AP Docket no. 121, Ex. C, Hr'g Tr. (Dec. 12, 2016) at 7:9-18. At the conclusion of the December 12 status conference, with the parties' agreement, the Court set a briefing schedule for the §155 Issues. AP Docket no. 48.

**E. The First Phase of the §155 Briefing**

The resolution of the §155 Issues has proceeded in two distinct phases. Briefing on the first phase of the §155 Motion was complete as of February 15, 2017, and the initial hearing was set for March 7, 2017.

The main thrust of Continental's initial argument was that an award under §155 was inappropriate because it had taken a legitimate position on the interpretation of the Plan, and had not caused any unreasonable delay in the litigation, or in paying Tendered Claims. To the extent there was any delay, Continental claimed it was entirely the fault of unreasonable positions taken by the Trustee. AP Docket nos. 57-59 ("Initial Brief" and Decs. Raymond J. Tittman and David Christian), no. 66 ("Reply Brief").

In support of the argument that it had not caused any delay, referring to the Summary Judgment Decision and the parties' discussions surrounding the December status conferences, counsel's Declaration stated:

> *I acknowledged that the Trustee had prevailed* and consequently I suggested that, as predicted, the Court's *Order did indeed resolve the issues in dispute*. The Trustee's counsel sought a trial but I advised that *we had already lost and judgment should be entered against Continental*. I also acknowledged that the Trustee had a right to seek fees and a penalty under 215 ILCS 5/155 but that a judgment need not be delayed on that account, and that the expense of a trial would not be necessary.

–10–

AP Docket no. 59, Dec. Tittman, ¶18-19 (emphasis added). Counsel also stated:

> I have never seen a party refuse to accept an offer of judgment in its favor for the full damage amount claimed, which would have still preserved the right to seek extra-contractual damages, and cannot fathom why the Trustee would not accept the judgment.

AP Docket no. 59, Dec. Tittman, ¶19.

In discussing its offer to have judgment entered and its astonishment at the Trustee's response that this would create piecemeal litigation, Continental also argued:

> Continental was admitting defeat, providing a substantial concession to the Trustee, and voluntarily foregoing other arguments it could have made, all in an effort to end this litigation.

AP Docket no. 66, n. 4.

The Trustee's initial §155 argument was that an award of fees and costs was appropriate because Continental vexatiously and unreasonably delayed paying the Tendered Claims and there was no *bona fide* dispute regarding the Plan that justified this. AP Docket no. 52 ("Trustee's Initial Brief" and Dec. Frank), nos. 63-64 ("Trustee's Reply Brief" and Dec. Frank). The Trustee also argued that he repeatedly tried to elicit a response from Continental on the allocation issue in order to determine how many additional Claims he had to submit to Continental before Continental would concede that the Tendered Claims exhausted all coverage under its Policies and end its unreasonable delay. AP Docket no. 52, Dec. Frank, ¶20-21.

When this first phase of briefing was completed in February 2017, Continental had not identified any Tendered Claims that (1) did not meet the TDP's medical requirements; (2) did not meet the

-11-

TDP's asbestos exposure requirements; or (3) were not covered by its Policies. AP Docket no. 52, Dec. Frank, ¶16.

**F. Continental Reverses Course**

On February 27, 2017, the Court moved the initial hearing on the §155 Motion from March 7 to March 27, 2017. Shortly before the March 27 hearing, Continental acquired new counsel and took the following steps that led to the second phase of briefing on the §155 Issues:

**1. Ex Parte Application to File Attorney's Declaration**

On March 20, 2017, Continental filed an Ex Parte Application for Court Approval to File the Declaration of Raymond J. Tittman. AP Docket no. 69 ( the "Ex Parte Application"). The proposed Tittman Declaration attached excerpts of three Tendered Claims. By the Ex Parte Application, Continental sought to raise – for the first time – an argument that there were factual issues regarding the asbestos exposure evidence for the Tendered Claims.[6]

The Trustee filed Opposition arguing that, prior to this, Continental had never raised an evidentiary challenge to the sufficiency of the evidence supporting any Tendered Claims and the Ex Parte Application and the proposed Declaration belatedly sought to "conjure up a bona fide dispute that might forestall damages under §155." AP Docket no. 71. The Trustee also asserted that the sample Claims attached to the Tittman Declaration had

---

[6] As stated previously, the proposed Tittman Declaration misstates controlling Illinois law as requiring exposure during Continental's Policy periods and fails to recollect that by the terms of the TDP, an Allowed Claim required proof of exposure prior to 1980. AP Docket no. 69, ¶5-6.

Case: 15-04136    Doc# 133    Filed: 11/15/17    Entered: 11/16/17 10:09:43    Page 12 of 51

been submitted to Continental in May 2015. AP Docket no. 71.

On March 27, 2017, the Court entered an Order continuing the hearing on the §155 Motion to May 31, 2017. AP Docket no. 70. On March 29, 2017, the Court entered an Order denying the Ex Parte Application. AP Docket no. 73.

## 2. State Court Complaint and Letter

On May 10, 2017, Duane Morris LLP, new counsel for Continental ("New Counsel") submitted a letter to the Court. AP Docket no. 83 (the "Letter").[7] The Letter advised the Court that (1) on May 8, 2017, new counsel for Continental had sued the Trustee in state court in Illinois for declaratory relief regarding its insurance coverage; (2) "significant insurance coverage issues have emerged as to whether the tendered claims 'trigger' the Continental" policies; (3) Continental had "newly discovered evidence" showing that "any exposure" would have occurred years prior to the inception of Continental's policies; (4) there was "no evidence" that the claimants were diagnosed with an asbestos related disease or sickness during its policy periods; and (5) "no coverage is available" for the Tendered Claims.

The Letter went on in this vein, concluding "in light of these new important and significant developments and our recent involvement in this case," the Court should set a status conference "so we can more fully advise the Court of these new

---

[7] In the Letter, New Counsel says the firm was "recently retained." New Counsel previously represented Safety National, Debtors' excess insurer.

-13-

developments." AP Docket no. 83.[8]

### 3. Motion to Stay or Postpone Hearing on §155 Motion

On May 10, 2017, New Counsel filed a Motion to Stay or Abate the Hearing and Further Proceedings on the §155 Motion. AP Docket no. 84 (the "Motion to Stay"). The Motion to Stay was supported by a Declaration of Raymond J. Tittman. AP Docket no. 90.

The Motion to Stay argued that the §155 Issues were not ripe because Continental's coverage obligations had not been decided, and this Court did not have jurisdiction to decide them. Continental also argued that its alleged "newly discovered evidence" showed that Debtors did not sell asbestos products after December 31, 1972 which meant that *none* of the Tendered Claims showed exposure during Continental's Policy periods and *none* of the Tendered Claims alleged that a Claimant suffered a sickness or disease resulting from exposure to Debtors' asbestos products during its Policy periods so none of the Tendered Claims triggered Continental's Policies. AP Docket no. 84 at 9:12-25; AP Docket no. 90, Dec. Tittman (describing alleged "newly discovered evidence" and attaching excerpts from depositions and written discovery responses from state court litigation in 1989 and 1994 which included a list of Chicago Fire Brick products indicating use of asbestos in them ceased as of December 1972). Continental also asked for a hearing on shortened time or a continuance of the hearing on the §155 Motion. AP Docket no. 85.

---

[8] In response to the Letter, which the Court viewed as an improper ex parte contact, and the filing of the state court complaint, which the Court viewed as a violation of the *Barton* doctrine, the Court issued two Orders to Show Cause directed at Continental and its New Counsel. AP Docket nos. 95 and 96.

-14-

The Trustee filed an Objection to the Motion to Stay and to the request for a hearing on shortened time. AP Docket no. 93. The Trustee argued that (1) the so-called "newly discovered evidence" had, in substantially the same form, been given to Continental's counsel in October *2009*;[9] (2) there was no support for the assertion that refractory products installed in the 1960's and 1970's would no longer be present in the 1980's - the underlying premise of Continental's revised position that its Policies did not provide coverage for *any* Tendered Claim; (3) internal Continental documents that Continental had provided to the Trustee showed that in 1987 Continental acknowledged that "severe asbestos exposure exists from prior products which [CFB] manufactured in the mid-1970's;"[10] and (4) the allegation that *none* of the Tendered Claims involved a manifestation of sickness or a diagnosis of disease during the Policy periods was demonstrably false.

Finally, the Trustee argued that Continental should be judicially or equitably estopped from claiming the coverage issues were not ripe when Continental had clearly stated on many occasions that "there was nothing left to try" and judgment should be entered against it on the coverage aspect of the Trustee's case.

---

[9] The Trustee's Objection attaches a 2009 letter to Continental's counsel David Christian providing similar discovery documents and the same list of products with the same 1972 change in formulation as attached to the Tittman Declaration. Compare AP Docket no. 93, Ex. C-E with AP Docket no. 90, Dec. Tittman, Ex. 2-3. Continental has not responded to this assertion.

[10] See AP Docket no. 93, Ex. E (Continental's internal memo from 1987).

-15-

The Court denied Continental's request for a hearing on shortened time. AP Docket no. 94. Continental later filed and then withdrew a notice of hearing on the Motion to Stay. AP Docket no. 113.

**4. Motion to Abstain**

On May 10, 2017, Continental also filed a Motion to Abstain and Remand from Insurance Coverage Issues, with a notice of hearing for June 15, 2017. AP Docket nos. 86-87 (the "Motion to Abstain"). In the Motion to Abstain, Continental described the same "newly discovered evidence" and argued that the test for permissive abstention under 28 U.S.C. §1334(c)(1) was met. In addressing the permissive abstention factors identified in In re Tucson Estates, Inc., 912 F.2d 1162 (9th Cir. 1990), Continental stressed that state law regarding insurance coverage controlled and this Court should defer to the state court where Continental had just filed the complaint for declaratory relief described above. Continental also insisted that this Court lacked jurisdiction over the insurance coverage issues - as either core matters or as matters related to this bankruptcy case under the close nexus test articulated in Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d. 1189 (9th Cir. 2005).

The Court later instructed Continental to withdraw the Motion to Abstain and on May 30, 2017, Continental withdrew only its notice of hearing. AP Docket no. 103.

**G. The Second Phase of the §155 Briefing**

On May 25, 2017, the Court moved the hearing on the §155 Motion to June 15, 2017. At the June 15 hearing, the Court ordered supplemental briefing on the §155 Motion to allow

-16-

Continental to address the Trustee's estoppel arguments. AP Docket nos. 112, 117.

In stark contrast to its first position on the §155 Issues, but as the above series of events foretells, Continental's supplemental briefing argues that the §155 Issues are not ripe because the coverage issues must first be resolved in state court and its "newly discovered evidence" shows there is no coverage for any Tendered Claims, and this prevents application of any estoppel theories. AP Docket no. 125 ("First Supplemental Brief"). The First Supplemental Brief is supported by Declarations of two of its attorneys (Raymond Tittman and David Christian), a purported expert, two former employees of Chicago Fire Brick, and an account manager from Resolute Management, Inc., Continental's claims agent. AP Docket nos. 125-2, 125-5, 125-11, 125-12, 125-13, 125-14. Ignoring its previous request that judgment be entered against it, these Declarations are intended to show there are unresolved factual issues regarding insurance coverage for the Tendered Claims.

In his supplemental briefing, the Trustee argues that judicial estoppel and equitable estoppel preclude Continental from changing its position on the coverage issue and judgment should be entered as previously discussed with Continental. The Trustee also argues that Continental's flurry of activity since March 2017 is responsible for additional expense and an additional unreasonable delay, confirming Continental's vexatious and unreasonable conduct under the Plan and its Policies. AP Docket nos. 121-123 ("Trustee's Supplemental Brief" and Decs. Frank and Kleinman), nos. 128-129 ("Trustee's Sur-Reply" and Dec.

-17-

Chatz).

**IV. Section 155 Standard**

Section 155 provides an extra-contractual remedy for an insured whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable. <u>Cramer v. Insurance Exchange Agency</u>, 174 Ill.2d 513, 519 (1996).

Section 155 provides in relevant part:

(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs; [or]

(b) $60,000...

Section 155 is intended to prevent an insurer from using its superior financial position to profit at its insured's expense. <u>Valdovinos v. Gallant Insurance Co.</u>, 314 Ill.App.3d 1018, 1022 (2000) (citing <u>Myrda v. Coronet Ins. Co.</u>, 221 Ill.App.3d 482 (1991); insurance company acted vexatiously when it insisted, without evidence, that plaintiff had stolen his own car).

In deciding whether an insurer is liable under §155, the Court is to consider the totality of the circumstances, including the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of its property. <u>Buais v. Safeway Insurance Co.</u>, 275 Ill.App.3d 587, 592 (1995) (complaint stated cause of action under §155 when it

-18-

alleged insurer erected a stone wall between itself and its insured, insurer refused to evaluate, investigate, or even talk about a claim where there was no bona fide dispute about coverage and it knew it would have to pay out the full amount of its policy); Keller v. State Farm Ins. Co., 180 Ill.App.3d 539, 555 (1989) (collecting cases; the question of vexatious and unreasonable delay is a factual one based upon an assessment of the totality of the circumstances taken in broad focus; the attitude of the insurer must be examined).

An award under §155 is not appropriate where (1) there is a *bona fide* dispute regarding coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law. Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co., 200 F.3d 1102, 1110 (7th Cir. 2000) (collecting cases).

A *bona fide* dispute is one that is "real, actual, genuine, and not feigned." McGee v. State Farm Fire & Cas. Co., 315 Ill.App.3d 673, 683 (2000) (referring to Black's Law Dictionary for definition of *bona fide*, finding complaint stated claim under §155 where it alleged insurer failed to pay despite clear evidence that loss exceeded policy limits, failed to promptly and thoroughly investigate loss, failed to use trained personnel to evaluate loss, failed to negotiate and settle in good faith and in a prompt manner). An insurer is supposed to rely on evidence for the existence of a *bona fide* dispute. See Morris v. Auto-Owners Ins. Co., 239 Ill.App.3d 500, 509 (1993) (appellate court found evidence supported insurer's decision to deny coverage).

-19-

Vexatious delay is defined as delay without reasonable or probable cause or excuse; neither time alone, nor any other single factor is controlling in determining whether an insurer is guilty of vexatious delay in refusing to settle a claim. Lazzara v. Howard A. Esser, Inc., 622 F.Supp. 382, 386 (D. N.D. Ill. 1985) (because of open legal issue it was not unreasonable for insurer to refuse settlement). The length of the delay that may be found vexatious varies depending on the facts of the case. See Brown v. State Farm Fire & Casualty Corp., 33 Ill.App.3d 889, 896 (1975) (fourteen months was vexatious delay); Kespohl v. Northern Trust Co., 131 Ill.App.2d 188 (1970) (five years was not vexatious delay in payment of interest).

In its Initial Brief in opposition to the §155 Motion, Continental misstates the applicable standard. Continental cites Aldrich v. Dunham, 16 Ill. 403, 404 (1855) as support for its argument that "to appear and defend a suit is a right which cannot be construed into unreasonable and vexatious delay of payment without impairing that right itself." AP Docket no. 57, Initial Brief, at 9:1-9. Continental then cites Hamilton v. Am. Gage & Mach. Corp., 35 Ill.App.3d 845, 854 (1976) to support its claim that "where litigation results in the delay of payment, 'the petitioner must establish contrivance on the part of the litigant which approximates actual fraud.'" Id.[11] Continental then states "in other words, the insurer must adopt an unreasonable coverage position that it knows is unreasonable. Id. In its Reply, Continental repeats that the standard is

---

[11] These cases involved the right to be paid interest for vexatious and unreasonable delay in payment, not §155.

-20-

"contrivance which approximates actual fraud" which it again equates with the entirely different standard it describes as the adoption of "an unreasonable coverage position that it knows is unreasonable." AP Docket no. 66, Reply, at 7:5-20. Not content with this fallacy, Continental then goes one step farther to claim that the Trustee has not disagreed with Continental's incorrect articulation of the standard as a position which "approximates fraud." Id.

There is a stark difference between a "contrivance which approximates fraud" and "knowingly advancing an unreasonable coverage position." However, the standard for liability under §155 is neither of these; it is "objectively unreasonable conduct that injures an insured." Great Lakes Dredge & Dock Co. v. City of Chicago, 260 F.3d 789, 797 (7th Cir. 2001) (affirming propriety of an award under §155 for two year delay in payment, remanding for calculation of award).

## V. Discussion of §155 Factors

### A. Delay in the Litigation

In the first phase of its briefing on the §155 Issues, Continental argued that it did not delay this litigation at any point and, in fact, worked to accelerate its resolution by suggesting immediate briefing of the threshold legal issue in dispute – the interpretation of §8.3 of the Plan. Docket nos. 57, 66. Continental also contended that it again tried to resolve the case after the Court's Summary Judgment Decision by offering to have judgment entered against it and then resolve the §155 Issues without a trial. Continental contended that this was, in effect, an offer to waive the defenses available to it in the Plan. AP

Case: 15-04136   Doc# 133   Filed: 11/15/17   Entered: 11/16/17 10:09:43   Page 21 of 51

Docket no. 66, n. 4. Continental accused the Trustee of creating delay by refusing "to accept victory."

The Trustee responded that, at every juncture, he had agreed to the procedural path preferred by Continental – twice agreeing to drop his request that the Court set a trial date. AP Docket nos. 52, 63. In December 2016, Continental's offer to have judgment entered was discussed, and was not refused. The parties agreed that one judgment would be entered in order to avoid piecemeal appeals. AP Docket no. 64, Dec. Frank, ¶41-42; AP Docket no. 63, n. 10.

Assuming for the sake of argument that the Trustee should have had to file this Adversary Proceeding, a brief review of the milestones in this case shows it did proceed efficiently until Continental began to pursue its "newly discovered evidence" gambit. The earlier efficiency was not due to any heroic efforts on Continental's part. In itself, the fact that Continental may not have unreasonably delayed the litigation does not end the inquiry. See Keller v. State Farm Ins. Co., 180 Ill.App.3d 539, 555 (1989) (court looks to totality of circumstances).

**B. *Bona Fide* Dispute Regarding the Plan**

A *bona fide* dispute is one that is real, actual, genuine, and not feigned. McGee v. State Farm Fire & Cas. Co., 315 Ill.App.3d 673, 683 (2000). In its first phase of briefing the §155 Issues, Continental argued that it had adopted a reasonable interpretation of the Plan even though the Court disagreed with Continental's interpretation. Continental is correct that just because its preferred interpretation of §8.3 did not carry the day does not mean that its conduct was vexatious and

-22-

unreasonable. <u>See</u> <u>American States Ins. Co. v. CFM Construction Co.</u>, 398 Ill.App.3d 994, 1003 (2010) (finding that insurer was not liable for attorney fees and costs under §155 merely because it litigated and lost the issue of insurance coverage); <u>See Medical Protective Co. v. Kim</u>, 507 F.3d 1076, 1087 (7th Cir. 2007) (no §155 award where there was reasoned argument and a difficult coverage question).

Continental also claimed its position was not an unreasonable one because it cited certain authority in support of its allocated percentage arguments. However, none of its authority actually supported the outcome Continental sought. Tellingly, Continental offered no authority to support its contention that an allocation of 100% was *not* an allocation under Illinois law. Continental also claimed its position was not unreasonable because there was no clear precedent on the disputed issues. Again, this is not persuasive. <u>See</u> <u>Verbaere v. Life Investors Ins. Co. of America</u>, 226 Ill.App.3d 289, 298-99 (1992) (insurance company persisted in a plainly unreasonable interpretation of its own policy; lack of precedent was no excuse).

As discussed in the Summary Judgment Decision, the Plan language did not require a nuanced interpretation. In the Proposals, the Trustee was permitted to state his *contention* regarding Continental's allocated percentage. The Trustee had valid reasons for the allocation he proposed - controlling Illinois law permitted it and the facts regarding the liquidated value of all Allowed Claims and the limited fund to pay them supported it. Adopting a strained and unreasonable reading of the

-23-

Plan, Continental categorically rejected the Tendered Claims instead of reviewing them and responding to them on the merits within 90 days as it had agreed to do under the Plan.

The Summary Judgment Decision also found that Continental's interpretation of the Plan was a strained and unreasonable one and its equitable contribution argument lacked merit. Because of the posture Continental took, the Trustee continued to send Proposals to Continental after the First Amended Complaint was filed and the liquidated value of the Tendered Claims thus continued to increase. This meant that the strength of any allocation argument Continental may have had declined with every submission of Tendered Claims. Continental also unreasonably failed to discuss the allocation issues with the Trustee which further delayed resolution of this case and imposed unnecessary expense on the Trust.

In addition, the circumstances changed dramatically with Continental's "newly discovered evidence" theory and its newly strained interpretation that would eviscerate §8.3 and allow it to resolve its coverage obligations in state court. As a party bound by the Plan, as a participant who negotiated the relevant terms of the Plan, and as an insurer whose obligations were incorporated into the Plan, Continental has engaged in objectively unreasonable conduct that has injured its insured.

**C. Delay in Paying Tendered Claims**

The Trustee argues that based on the available evidence and the clear language of §8.3, by the end of December 2015, there could be no *bona fide* dispute regarding coverage for the Tendered Claims and Continental's obligation to pay them; in short,

-24-

Continental's continued delay is, by definition, vexatious.

Between May 2015 and September 2015, the Trustee submitted 249 Claims to Continental with a liquidated value of more than $3.4 million. In August 2015, Continental acknowledged that its Policies would likely be exhausted based on the anticipated volume of Tendered Claims. By December 2015, Continental knew the liquidated value of the Allowed Claims was $46 million and the Trust had approximately $14 million to pay them on a pro rata basis.[12] The Trustee filed this Adversary Proceeding at the end of December 2015 when it became clear that Continental's response to each Proposal was that a 100% allocation was not an allocation permitted by the Plan. After the Adversary Proceeding was filed, the Trustee continued to send Proposals to Continental and, by August 2016, the liquidated value of the 1,547 Tendered Claims was more than $8.3 million.

In December 2016, Continental acknowledged that it had lost and proposed that judgment should be entered against it for its coverage obligations. At that point, Continental convinced the Court and the Trustee that the §155 Issues should be decided without a trial. As of then, Continental had not contested any of the more than 1,500 Claimants' exposure to asbestos-containing products for which the Trust has liability, contested the medical

---

[12] To make this concrete, under the TDP, Allowed Claims are valued as follows: mesothelioma $40,000; lung cancer $10,000; certain other cancers $10,000; asbestosis/pleural disease $2,000. The holder of one of these Claims will receive only a pro rata payment of the allowed amount of its Claim. Because this chapter 11 case was filed in 2001, holders of Allowed Claims have already suffered an extraordinary delay in receiving this minimal compensation.

–25–

evidence substantiating the disease level for any Tendered Claim, or contested the fact that each Tendered Claim involved exposure to asbestos for which its Policies provided coverage. Yet it failed to pay a single Tendered Claim and then, with the arrival of its new counsel, it began to chase its new theories generating additional vexatious delay.

Continental argues that the Trustee is responsible for any delay in paying Tendered Claims because the Trustee (1) refused to pay Allowed Claims to establish that the other primary policies were actually exhausted which meant allocation remained a real issue; (2) failed to give Continental copies of the other primary insurers' policies preventing it from analyzing allocation issues; (3) refused to give Continental information regarding the exposure dates for the Non-Tendered Claims which the Trustee easily could have done, thus preventing it from analyzing allocation and exhaustion of its Policies; and (4) provided insufficient information with its submissions of Tendered Claims. AP Docket nos. 57, 58, 59, 66, 125. Continental also claims it made "consistent efforts to resolve this dispute amicably" but was rebuffed by the Trustee. AP Docket nos. 57, 66.

### 1. Exhaustion by Payment

Continental's first argument is easily dismissed. The Plan requires *pro rata* payment on Allowed Claims and until this litigation is resolved, the Trust will not be in a position to make another distribution on Allowed Claims. The argument that the Trust caused delay by failing to "actually exhaust" the other insurance proceeds was an unreasonable one considering Continental's involvement in the drafting of the Plan and the

-26-

sophistication of its bankruptcy counsel.

### 2. Other Insurance Policies

Continental's second argument also lacks merit. A basic premise for Continental's argument that allocation is required is that there are "other insurance" clauses in its policies which in turn require it to review the other primary insurers' policies to establish the correct method of allocation.[13] Continental accuses the Trustee of failing to provide complete copies of the other primary insurance policies in connection with its initial disclosures and in response to Continental's discovery. AP Docket no. 59, Dec. Tittman, ¶7-8, ¶12 ("We requested the other primary policies in our document requests and the Trustee offered to produce them in response. Nevertheless, the Trustee still failed to produce the policies.")

While Continental persists in its claim that the Trustee failed to provide the other insurance policies, the record reflects that they were provided to Continental in March 2016 or in October 2016. AP Docket no. 64, Dec. Frank, Ex. 5 (March 2, 2016 letter to Continental saying "you have previously received all the information necessary to evaluate the insurance obligations of both Continental and all of the other insurance carriers..." and "if there are additional documents you require related to the Tendered Asbestos Claims or other insurance

---

[13] Two of the three Continental policies in the record do not contain pages with this "other insurance" language. The Court assumes Continental knows if these provisions are in them and knows the standard CGL policy provisions in use during the relevant time periods. The argument that it needed the other policies may in fact be a smokescreen.

-27-

carriers, please identify them at once."); ¶17 (stating Trust's counsel received no response to this letter); ¶32-34 (stating copies of the available insurance policies were included in the Trustee's September 30, 2016 document production delivered to Continental's counsel as of October 3, 2016). This evidence outweighs Continental's bare assertions and the vague statements in its counsels' Declarations that the Trustee failed to provide the other insurance policies. AP Docket no. 125-2, Dec. Tittman; AP Docket no. 125-5, Dec. Christian.

Accordingly, assuming this request had a legitimate basis – but suspecting it did not – as of at least October 2016, and perhaps as early as March 2016, Continental no longer had this alleged failure by the Trustee as an excuse for being unable to analyze allocation and engage in a substantive discussion with the Trustee.

### 3. Allocation

A brief review of the Trustee's efforts to pin Continental down on its allocation theory is relevant to the question of delay and the charge that the Trustee rebuffed Continental's efforts to resolve this case amicably. The Trustee began sending claims to Continental in May 2015 and by August 2015, the parties were aware of their basic dispute regarding the tension between Illinois law's "all sums" rule and the Plan's allocated percentage language. At that point, Continental acknowledged that there may in fact be no point of disagreement, depending on the volume of Claims the Trustee would ultimately submit to Continental. AP Docket no. 52, Dec. Frank, Ex. 3 (Continental's August 14, 2015 letter to Trustee); AP Docket no. 66 at 9-10. The

-28-

Trustee continued sending Proposals to Continental, culminating in the 1,547 Tendered Claims which had a liquidated value $8.3 million as of August 2016. AP Docket no. 64, Dec. Frank, ¶7.

In March 2016, the Trustee asked Continental to explain an allocation theory it would accept. AP Docket no. 64, Dec. Frank, ¶16-17, Ex. 5 (March 2, 2016 letter to Continental). Continental did not respond.

In its May 2016 Summary Judgment Brief, Continental said its Policies would dictate an allocation, either "equal shares" or "pro rata by limits," depending on the other primary insurers' policies and a more complete analysis would be in Continental's Summary Judgment Reply. AP Docket no. 27, at 24:10-13. Continental's Summary Judgment Reply took the position that the allocation issue was not yet ripe. AP Docket no. 34, at 16:20-23.

The Trustee repeated the request that Continental disclose its allocation theories on multiple occasions. Docket no. 64, Dec. Frank, ¶18 (describing six proposals made to Continental between March 2016 and August 2016). For the first time, in its February 2017 Initial Brief in opposition to this §155 Motion, Continental posited a theoretical "time on the risk" allocation. AP Docket no. 57 at 14:15-25.[14]

This history is given to illustrate the nature of Continental's response and its failure to engage with the Trustee to resolve this litigation in an objectively reasonable manner. Continental's initial view that the dispute regarding the Plan's

---

[14] The Trustee disagrees with Continental's application of this theory to the facts. More relevant at this time is the fact that Continental waited until February 2017 to reply.

–29–

allocation language might not have a "significant economic difference over the long term" seems to have been a reasonable position. AP Docket no. 52, Dec. Frank, Ex. 3 (Continental's August 14, 2015 letter to Trustee). But after saying this, Continental adopted an unreasonable position when it categorically rejected the Proposals because the Trustee used a 100% allocation, and thereafter declined to engage in the process that would have made it unnecessary to start with or led to its prompt resolution. Continental failed to review any of the Tendered Claims - apparently at least until March 2017 when it tried to file the Tittman Declaration attaching three claims that had been tendered in May 2015 - and then began its "newly discovered evidence" campaign with evidence that appears to have been provided to it in 2009. On this record, Continental failed to engage in good faith in any substantive discussion with the Trustee regarding the dispute. Because it had the other insurance policies - or because there is no basis for the assertion that it needed them - Continental could have provided at least a theoretical response to the Trustee on this allocation question in October 2016 (if not far earlier). It could have responded to the Trustee's requests that it articulate some allocation method instead of stonewalling the Trustee's efforts to resolve this case on the merits. Continental inexplicably and unreasonably failed to engage in this sort of discussion and thus engaged in vexatious and unreasonable delay.

### 4. Incomplete Information

Continental also argues the Trustee is responsible for any delay because the Tendered Claims provided "incomplete

-30-

information" and the Trustee submitted corrupt or unreadable disks. AP Docket no. 58, Dec. Christian, ¶11; AP Docket no. 125-2, Dec. Tittman, ¶22; AP Docket no. 125-5, Dec. Christian, ¶4, ¶10, ¶13. In support of these vague assertions, Continental relies heavily on an excerpt from its August 4, 2015 letter to the Trustee and a June 2016 letter from the Trustee sending certain claim information that the Trustee admits had been inadvertently omitted.[15] However, the Trustee points out that Continental has never informed it that there are still missing documents or corrupt disks despite the Trustee's request that Continental do so. AP Docket no. 64, Dec. Frank, ¶17, ¶20-23, ¶27.

Continental's argument that an alleged lack of information justifies its failure to pay Tendered Claims is disingenuous at best. Continental's response to the Tendered Claims was that an allocation of 100% to Continental was not permissible under the Plan, not that any particular Claim lacked evidentiary support or any batch of Tendered Claims was incomplete or deficient.

Continental also relies heavily on the argument that the Trustee is at fault for refusing to provide exposure information for the Non-Tendered Claims from the Trustee's "Verus database." This information is irrelevant according to the Trustee and Continental requested it solely for the purpose of generating delay and expense for the Trustee. As explained in the Summary

---

[15] See AP Docket no. 64, Dec. Frank, ¶22-23(explaining how the Trustee became aware of the omission when he received Continental's discovery responses and promptly remedied it); AP Docket no. 129, Dec. Chatz, ¶25 (explaining these missing claim forms were for claims tendered after this litigation commenced).

-31-

Judgment Decision, there are 12,365 Allowed Claims with a liquidated value of $38.1 million which were not tendered to Continental. Of these, 1,037 Allowed Claims with a liquidated value of $14.9 million involve occupational exposure to asbestos prior to Continental's Policy periods.[16]

According to the Trustee, with few exceptions, the Tendered Claims are supported by evidence showing that the Claimant worked at a jobsite at which Debtors' asbestos was present, continued to work at such a jobsite while one of Continental's Policies was in effect, and had an occupation that would reasonably be expected to expose the Claimant to asbestos dust. AP Docket no. 71, at 4:26-5:4; AP Docket no. 93, at 10:22-11:1. Without question, the Non-Tendered Claims exhaust the fund created by the settlements with the other primary insurers, leaving only Continental's Policies available to pay the $8.3 million in Tendered Claims. Allocation of less than 100% to Continental - or equitable contribution as between Continental and the fund created by the settlements with the other primary insurers - is entirely academic. Information regarding exposure dates for the Non-Tendered Claims is irrelevant.

It is still unclear when Continental actually began to look at the merits of the Tendered Claims - assuming for the sake of argument that it has in good faith done so. It is clear that any

_____

[16] Debtors' other solvent primary insurers' policy periods ran from 1959 to 1980 and 1983 to 1985. An insolvent primary insurer's policies covered 1980 to 1983. Debtors' excess carrier Safety National provided coverage for 1982 to 1986.

-32-

such review was outside the 90 days set in the Plan.[17] The Declarations filed in support of its supplemental briefing show that the so-called expert and the two former Chicago Fire Brick employees were first contacted in late March and April 2017. AP Docket no. 125-11, Dec. Rechter, ¶8; AP Docket no. 125-12; Dec. Schroth, ¶8; AP Docket no. 125-13, Dec. Helwig, ¶8. This was months after Continental had admitted - both under penalty of perjury and in open court - that it had lost, that its coverage obligations had been determined, and that judgment should be entered, leaving only the §155 Issues to be decided. In doing this, Continental necessarily admitted its Policies were triggered. Its current effort to rewrite this history compels a conclusion that it has vexatiously and unreasonably delayed paying the Tendered Claims.[18]

## VI. Judicial Estoppel

### A. Judicial Estoppel Standard

Federal law governs the application of judicial estoppel in federal courts because it is the federal court's integrity that

---

[17] The Trustee says Continental has never responded in any way to his September 29, 2015 Proposal containing 175 Claims with a liquidated value of $1,750,000. AP Docket no. 129, Dec. Chatz, ¶7. This is a significant percentage of Continental's $2.5 million in Policy proceeds.

[18] The Trustee also argues that Continental abdicated its responsibility to review Tendered Claims through its relationship with Resolute Management, Inc. Resolute's role and its relationship with Continental is unclear. AP Docket no. 64, Dec. Frank, Ex. 14; AP Docket no. 125-13, Dec. Martin. It is clear that Continental categorically rejected each Proposal because of the 100% allocation, admitted it had lost in December 2016, then abruptly reversed course in March 2017 with New Counsel using a new basis on which to categorically reject Tendered Claims.

-33-

is at stake. Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC, 692 F.3d 983, 992 (9th Cir. 2012); Rissetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597, 603 (9th Cir. 1996). Judicial estoppel's purpose is to protect the integrity of the judicial process by prohibiting a party from deliberately changing positions simply because its interests have changed. New Hampshire v. Maine, 532 U.S. 742, 749 (2001). Judicial estoppel protects "against a litigant playing fast and loose with the courts." Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990).

The factors that a court should consider when addressing the doctrine are described in New Hampshire v. Maine: First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled. Third, courts are to consider whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. New Hampshire v. Maine, 532 U.S. at 750-51. The Supreme Court cautioned that these were not inflexible prerequisites or an exhaustive formula for determining applicability of judicial estoppel and additional considerations may inform its application in specific contexts. Id.

**B. Application of Judicial Estoppel**

The elements of judicial estoppel described in New Hampshire v. Maine are all present here.

-34-

**1. Inconsistent Positions**

Continental's current position that its coverage obligations must be decided in a state court is clearly inconsistent with its first position that it had lost on the coverage issue and it was ready to have a judgment entered against it.

Continental argues first that insurance coverage cannot be created by estoppel. <u>Schuster v. Occidental Fire & Casualty Co.</u>, 30 N.E.3d 458 (Ill. App. 1st 2015) (as a matter of contract interpretation, summary judgment was appropriate where policy provided no coverage for leased vehicles, only owned vehicles; estoppel not discussed). Continental then claims it never took an inconsistent position as to the "trigger of coverage" and the only position it took was that a trial date was not necessary. Continental now claims it took this position because this Court does not have jurisdiction to hold a trial on coverage issues.

These arguments simply do not hold up. The Trustee is not seeking to create insurance coverage by estoppel. The Trustee is seeking to prevent Continental from taking a clearly inconsistent position on coverage and from playing fast and loose with this Court.

The Plan resolved Continental's proof of claim by creating a mechanism for the resolution of its coverage obligations. Pursuant to §8.3, the Trustee submitted Proposals for Claims that triggered Continental's coverage. After it was sued, Continental raised coverage issues in its affirmative defenses and in its Counterclaim. Following the Summary Judgment Decision,

-35-

Continental admitted it had lost on the coverage issue.[19] Its current position is starkly inconsistent.

Continental tries to minimize the importance of its counsel's written and oral statements that Continental "had lost." Continental now claims these statements were simply motivated by a desire to ensure efficient progress in this litigation. AP Docket no. 125-2, Dec. Tittman, ¶17 ("In any statements I have made ... my sole motivation was to try to be creative in ways to manage this case more efficiently.")

Taken in context, these statements were not meaningless "off-the-cuff" remarks. Counsel described the offer to the Trust as "judgment in its favor for the full damage amount claimed." AP Docket no. 59, Dec. Tittman, ¶2, ¶6, ¶18-19; AP Docket no. 121, Hr'g Tr. (May 3, 2016) at 22:19-23; AP Docket no. 121, Hr'g Tr. (Dec. 6, 2016) at 4:10-20, 8:10-19. This is a far cry from a statement encouraging efficient handling of litigation. In addition, Continental's motivation is irrelevant, it is the position stated that matters. See Helfand v. Gerson, 105 F.3d 530, 535 (9th Cir. 1997) (party was bound by position stated by its attorney in one court, judicial estoppel precluded party from taking inconsistent position in another court; judicial estoppel applies to a party's stated position regardless of whether it is an expression of intention, a statement of fact, or a legal

---

[19] At oral argument on July 26, 2017, referring to §8.3 of the Plan, New Counsel stated "coverage is separate from what was envisioned as far as a procedure under the Plan." AP Docket no. 128, Ex. A, Hr'g Tr. (July 26, 2017) at 43:12-14. This is a spurious distinction. Section 8.3(a) provides in pertinent part that if Continental accepts a Proposal it *shall pay* the liquidated value of the Claims.

-36-

assertion).

Continental's argument that this Court's alleged lack of jurisdiction is the rationale for its current position is revisionist history of an almost laughable sort. Continental's Answer did take the position that this was not a core proceeding but Continental also filed a Counterclaim and agreed to continue litigating in this Court. AP Docket no. 121, Ex. D, Hr'g Tr. (May 3, 2016) at 8. Continental has expressly or impliedly consented to proceeding on the coverage issue in this Court. Wellness Int'l Network, Ltd. v. Sharif, 135 S. Ct. 1932 (2015). Beyond that, because this coverage dispute affects the interpretation, implementation, consummation, execution, or administration of the Plan, it fits well within the close nexus test articulated in Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d 1189 (9th Cir. 2005).

### 2. Success in Persuading the Court to Adopt Continental's First Position

Continental succeeded in persuading the Court to adopt its approach to this litigation. Without a doubt, this Court relied on the positions Continental took in May 2016 and in December 2016. At the first status conference, Continental told the Court deciding the legal issue regarding §8.3 of the Plan would resolve the entire case. Instead of setting a trial date as the Trustee then requested, the Court deferred to Continental and set a briefing schedule for Continental's summary judgment motion. In December 2016, Continental told the Court that, as Continental had predicted, the Summary Judgment Decision had resolved the entire case and judgment should be entered. The Trustee asked for

-37-

a trial date on the §155 Issues but the Court again deferred to Continental and set a briefing schedule instead.

Continental argues that the Court could not have relied on its counsels' statements because Continental never briefed or argued a position on the "trigger of coverage" and the Court never had evidence or ruled on this issue. This argument is not convincing. The Court relied on Continental's assertion that a trial date was not necessary because, as Continental's counsel explained, "we had already lost and judgment should be entered against Continental." AP Docket no. 59, Dec. Tittman, ¶18. This was an admission that the Tendered Claims triggered Continental's Policies. Evidence on the "trigger of coverage" was not presented because Continental said it had lost on this point.

If Continental is permitted to litigate coverage in state court, this Court will have been misled by Continental over the last several years and Continental will be given an opportunity to mislead another court at the Trustee's expense.

### 3. Unfair Advantage or Unfair Detriment

Continental's shifting positions have harmed the Trust and its beneficiaries – both in terms of time and money. Allowing Continental to restart coverage litigation in state court would also present an unfair and undeserved advantage for Continental – again in terms of time and money.

As explained above, both the Trustee and the Court acted in reliance on Continental's earlier positions. The Trustee fully briefed the §155 Issues and then was required to respond to the barrage of motions filed by Continental since March 2017, and has had to address Continental's shifting narratives involving "newly

–38–

discovered evidence" and "newly developed evidence," none of
which appear to have any merit.[20] Continental has now
begrudgingly acknowledged that there are a few Tendered Claims
that include a diagnosis of asbestos-related disease during its
coverage periods. AP Docket no. 125-2, Dec. Tittman, ¶15 ("there
are approximately 20 claims that could potentially be categorized
as having a . . . manifestation or diagnosis of sickness or
disease during Continental's 1985-1987 policy periods."). Despite
this acknowledgement, Continental still refuses to pay a single
Claim.

Permitting Continental to litigate in state court would also
allow Continental to eviscerate the agreements embodied in the
Plan which Continental negotiated and described as the means by
which its proof of claim was resolved. It would also permit
Continental to prolong its campaign of stalling to avoid paying
Tendered Claims. The Trust (and its beneficiaries) will
necessarily suffer an unfair detriment from the expense and delay
this proposed state court coverage litigation would impose.

### 4. Inadvertence or Mistake

Finally, Continental claims any inconsistency in its prior
positions was based on inadvertence or mistake which precludes
estoppel. New Hampshire v. Maine, 532 U.S. at 753. Its counsel
claims he did not intend to mislead the Court in December 2016

---

[20] The Trustee also claims that in reliance on Continental's
statement that the decision regarding the interpretation of §8.3
would resolve this litigation, it did not take discovery on the
coverage issues other than asking for Continental's claim files
with respect to Tendered Claims. In its Initial Disclosures
Continental said these would be produced but they have not been.
AP Docket no. 122, Dec. Chatz, ¶11-15.

-39-

and tried to correct any "misstatements" as soon as he realized
it was necessary when he "learned of new facts" in March and
April 2017. AP Docket no. 125-2, Dec. Tittman, ¶10-13.

This aspect of Continental's argument is also deeply flawed.
Parties are bound by the conduct of their attorneys absent
egregious circumstances which are not present here. <u>See</u> <u>Anderson</u>
<u>v. Air West, Inc.</u>, 542 F.2d 522, 526 (9th Cir. 1976) (plaintiff
may not benefit from her attorney's failure to complete service
of process, leniency for plaintiff in the face of actual
prejudice to the other parties would permit her to benefit).

Continental does not argue that this so-called "newly
discovered evidence" was unavailable to it before December 2016,
only that it was "not aware" of it. In fact, the Trustee asserts
that substantially the same information had been provided to
Continental's counsel David Christian in October *2009* when
Continental first appeared in this chapter 11 case and the
Trustee's counsel, then representing the Debtors, approached
Continental regarding entering into a "buy-back" settlement like
the other solvent primary insurers had done. AP Docket no. 93,
Ex. C-D (2009 correspondence between Continental's counsel David
Christian and Joseph Frank). Continental has had an opportunity
to respond to this assertion and has remained silent.[21]

---

[21] If Continental were using Civil Rule 60(b)(2) to set aside
a judgment based on newly discovered evidence, it does not appear
that Continental exercised due diligence, or that its "newly
discovered" evidence would have been likely to change the
outcome. <u>Feature Realty, Inc. v. City of Spokane</u>, 331 F.3d 1082,
1093 (9th Cir. 2003) (evidence in party's possession before
judgment is not newly discovered; knowledge of party's prior
attorney is attributable to party for judicial estoppel).

-40-

Continental took the positions it took before March 2017 by design and not by inadvertence. Before March 2017, its §155 arguments were aimed at defeating an argument that it had unreasonably delayed the litigation and supporting its claim that it had a valid interpretation of the Plan. Upon the arrival of its new counsel, it has tried mightily to escape from its prior position. This is the sort of conduct the estoppel doctrine addresses and, for §155 purposes, the sort of conduct described as vexatious and unreasonable.

### 5. Conclusion regarding Judicial Estoppel

Applying the approach as instructed in <u>New Hampshire v. Maine</u>, the Court exercises its discretion to find that Continental is judicially estopped from reversing course. If it is not estopped, Continental will have succeeded in persuading this Court and the Trustee to take Continental at its word that judgment should be entered against it for its Policy proceeds and then succeeded in persuading this Court that it did not mean what it said. This is both unfair to the Trustee, and is an affront to this Court and the integrity of the judicial process. This erosion of the integrity of the judicial process will not be tolerated.

## VII. Equitable Estoppel

### A. Equitable Estoppel Standard

Continental argues that Illinois law applies to equitable estoppel. The Trustee has accepted this proposition.[22] According

---

[22] California law is substantially the same and would lead to the same result. <u>City of Goleta v. Superior Court</u>, 40 Cal.4th 270, 279 (2006); <u>Oakland Raiders v. Oakland-Alameda Cty.</u>

-41-

to the Illinois Supreme Court:

> The general rule is that where a person by his or her
> statements and conduct leads a party to do something that
> the party would not have done but for such statements and
> conduct, that person will not be allowed to deny his or
> words or acts to the damage of the other party. Equitable
> estoppel may be defined as the effect of the person's
> conduct whereby the person is barred from asserting rights
> that might otherwise have existed against the other party
> who, in good faith, relied upon such conduct and has been
> thereby led to change his or her position for the worse.

Geddes v. Mill Creek Country Club, Inc., 196 Ill.2d 302, 313

(2001) (internal citations omitted).

To establish equitable estoppel, the party claiming estoppel

must demonstrate that (1) the other person misrepresented or

concealed material facts; (2) the other person knew at the time

he or she made the representations that they were untrue; (3) the

party claiming estoppel did not know that the representations

were untrue when they were made and acted upon; (4) the other

person intended or reasonably expected that the party claiming

estoppel would act upon the representations; (5) the party

claiming estoppel reasonably relied upon the representations in

good faith and to his or her detriment; and (6) the party

claiming estoppel would be prejudiced by his or her reliance on

the representations if the other party were permitted to deny

their truth. Id. at 313-14. The party claiming estoppel must

prove it applies by clear and unequivocal evidence. Id.

As to the first two elements, the representation need not be

fraudulent in the strict legal sense or done with intent to

mislead or deceive. It is sufficient that a fraudulent or unjust

Coliseum, Inc., 144 Cal.App. 4th 1175, 1189 (2006).

-42-

effect results from allowing another person to raise a claim inconsistent with his or her former declarations. Id.

**B. Application of Equitable Estoppel**

In December 2016 Continental's counsel said in no uncertain terms that the case was decided and judgment for breach of contract should be entered against it. AP Docket no. 121, Ex. B, Hr'g Tr. (Dec. 6, 2016) at 4:10-20, 8:10-19. That is, Continental conceded that the Tendered Claims were covered by its Policies. Then, in his most recent Declaration, Continental's counsel states "Continental had not and has never conceded this [coverage] issue" and he "had no direction or authority to waive or relinquish any rights." AP Docket no. 125-2, Dec. Tittman, ¶16, ¶19. This reversal fits squarely within the first two elements described in Geddes. The unjust effect of permitting this is obvious. Continental will not be permitted to recast its prior statements as a mere effort to be "creative in ways to manage" the case. AP Docket no. 125; AP Docket no. 125-2, Dec. Tittman, ¶16-19. Continental's counsel's insistence that he believed his first statements were true when he made them does not relieve them of their importance and does not justify the current effort to depart from them. AP Docket no. 125-2, ¶18; AP Docket no. 121, Ex. D, Hr'g Tr. (June 15, 2017) at 43:3-5.

As to the third element, the Trustee has clearly and unequivocally established that he did not know that Continental disputed coverage. After the December status conferences at which Continental said the coverage issue had been decided and it was ready to enter judgment, the Trustee - and the Court - believed that the parties had agreed that one judgment would be entered

-43-

after the §155 Motion was decided. AP Docket no. 129, Dec. Chatz, ¶18, ¶22. Thus, until March 2017, the Trustee did not know that Continental disputed coverage for the Tendered Claims.

Continental also argues the Trustee "had more information about the claims than Continental and must know that most, if not all, of the [T]endered [C]laims do not trigger the Continental 1985-1987 policies." AP Docket no. 125, at 18:5-8. This statement insinuates that the Trustee is trying to defraud Continental into paying Tendered Claims. This sort of underhanded attack on a fiduciary is unwarranted and insulting.

The fourth and fifth elements are also established. The Trustee has shown that Continental intended or expected that its statements would be acted upon and, they were, in fact, acted upon. The Trustee acted by not insisting on a trial date in May 2016, by not pursuing discovery, by agreeing that the §155 Issues could be resolved on the briefs, and by agreeing, for a second time, that the Court did not need to set a trial date. AP Docket no. 121, Ex. B, Hr'g Tr. (Dec. 6, 2016) at 4:9-20, 5:1-6:25; AP Docket no. 128, Ex. A, Hr'g Tr. (July 26, 2017) at 44:12-45:2.

The prejudice to the Trustee if Continental is permitted to deny the truth of its earlier statements is apparent as explained above in the discussion of judicial estoppel.

For all these reasons, the Court finds that the elements for equitable estoppel have been clearly and unequivocally established. Allowing Continental to back away from its prior position and litigate coverage in state court would be inequitable and damaging to the Trust and its beneficiaries.
//

-44-

**VIII. Attorneys' Fees, Statutory Penalty, Interest**

    **A. Attorneys' Fees and Costs**

        **1. Applicable Standard**

Section 155 allows the Court to award reasonable attorneys fees and costs. In deciding on a reasonable fee, the Court is to consider the time and labor required, the novelty or difficulty of the issues, the skill required, the preclusion of other employment, the customary fee in the community, the amount of money involved in the case, the results obtained, and the attorneys' reputation, experience and ability. Kaiser v. MEPC American Properties, Inc., 164 Ill.App.3d 978, 984 (1987) (reciting standard); Verbaere v. Life Investors Ins. Co. of America, 226 Ill.App.3d 289, 301 (1992) (trial court erred in refusing to apply a market rate where insurance company failed to rebut market rate evidence, court found attorney's skill, standing, and benefit to clients supported award requested, amount of time required for case was attributable to insurance company's recalcitrant refusal to pay).

A contingency fee may or may not establish the reasonable fee. Mohr v. Dix Mutual County Fire Ins. Co., 143 Ill.App.3d 989, 1000 (1986) (finding liability under §155, parties stipulated that a reasonable contingency fee was one third of amount by which jury verdict exceeded initial settlement offer); Keller v. State Farm Ins. Co., 180 Ill.App.3d 539, 557 (1986) (purpose of §155 would be frustrated if recovery was restricted to contingent fee agreement, trial court erred in limiting fees to contingency fee when it found attorney's work was necessary and hourly rate was reasonable); UNR Industries, Inc. v. Continental Ins. Co.,

-45-

1  607 F.Supp. 855, 866 (D. N.D.Ill. 1984) (interpreting §155,
2  noting the amount of the attorneys fees bears no necessary
3  relation to the amount of the loss).

4      Under Illinois law, the Court has broad discretion in
5  matters of attorneys' fees. Will v. Northwestern Univ., 378
6  Ill.App.3d 280 (2007). The Court is not limited to the evidence
7  presented in arriving at a reasonable fee but may rely on its own
8  knowledge and experience to determine whether the hours claimed
9  and work performed are reasonable. Estate of Price v. Universal
10 Cas. Co., 334 Ill.App.3d 1010, 1015 (2002).

11              **2. Application of Standard**

12      The Trustee seeks an award of attorneys' fees and costs for
13 FrankGecker LLP and his local counsel Cooper White & Cooper.

14      When litigation with Continental looked inevitable, the
15 Trustee requested that FrankGecker agree to a hybrid contingency
16 fee agreement. AP Docket no. 52, Dec. Frank, Ex. 6 (the Retention
17 Agreement). The Retention Agreement reduced the hourly rates of
18 the FrankGecker attorneys from their customary hourly rates ($695
19 to $825 for partner Joseph Frank; $410 to $450 for associate
20 Jeremy Kleinman) to $375, and provided for a contingency fee for
21 additional compensation only upon a net recovery from
22 Continental, with a credit for payments made along the way. AP
23 Docket no. 52, Dec. Frank, ¶31.

24      The Retention Agreement also provided that FrankGecker would
25 be compensated in accordance with its normal hourly rates for all
26 services rendered to the Trustee other than this litigation,
27 including all work related to presentation of Claims to
28 Continental pursuant to §8.3 of the Plan. Because Continental's

                              -46-

response to the Tendered Claims was that the Trust had to perform an (as yet unspecified) allocation, the Trustee's counsel was required to continue reviewing Allowed Claims before tendering them to Continental. Between January 1, 2016 and August 31, 2016 FrankGecker attorneys spent 135.20 hours reviewing more than 1,500 Allowed Claims solely to identify Claims that triggered Continental's Policies. As an accommodation to the Trustee, FrankGecker agreed to bill at the reduced hourly rate of $375. As of January 2017, the total billed and paid for this aspect of the case was $49,987.50. AP Docket no. 52, Dec. Frank, ¶36, Ex. 7 (billing statements).[23]

Based on Policy proceeds of $2,512,444, the Trustee now seeks an award of attorney's fees of not less than $664,106.52 pursuant to the Retention Agreement, plus $49,987.50 for additional claim review. AP Docket no. 52, Dec. Frank, ¶32-36. The Trustee also seeks reimbursement for expenses of $9,364.03. AP Docket no. 128, at 29. The Trustee is entitled to recover these amounts as reasonable under §155.

As of July 13, 2017, FrankGecker had billed the Trustee and been paid for 915.80 hours of services related to this Adversary Proceeding for a total through June 30,2017 of $330,984. AP Docket no. 122, Dec. Chatz, ¶18.[24]

The Trustee's local counsel, Cooper White & Cooper, also

---

[23] At its customary hourly rates, the total due for these services would have been $58,524.50. AP Docket no. 52, Dec. Frank, ¶36.

[24] The Court has reviewed the FrankGecker billing statements *in camera*.

Case: 15-04136   Doc# 133   Filed: 11/15/17   Entered: 11/16/17 10:09:43   Page 47 of 51

agreed to bill the Trustee at a reduced hourly rate for this litigation. Peter Califano, the partner responsible for the work, agreed to reduce his customary hourly rate from $525 to $495 per hour. AP Docket no. 52, Group Ex. A (Cooper White & Cooper statements for December 2015 - January 2017); AP Docket no. 122, Dec. Chatz, ¶20-21, Ex. A (Cooper White & Cooper statements for January 2017 - June 2017; AP Docket no. 129, Dec. Chatz, Ex. F (corrected Cooper White & Cooper statements for May 2017 and June 2017). As of July 2017, Cooper White & Cooper had billed the Trustee and been paid $76,186 for fees and $866.19 for reimbursable expenses. The Trustee is entitled to include these amounts in his request for attorney's fees under §155.

The Court finds that the FrankGecker attorneys and the Cooper White & Cooper attorney are well qualified and their skill and competence are well established.[25] The Court also finds that hourly rate charged by Cooper White & Cooper is reasonable and customary.

In addition, to the extent relevant, based on the number of hours spent in this litigation, as of July 2017, FrankGecker's effective hourly rate was $712. AP Docket no. 121, at 18:16-18. This would also be a customary and appropriate rate in this sort of case in the Northern District of California.

Continental also claims the $375 reduced hourly rate is more than Continental allegedly pays at least one of the firms it has

---

[25] In September 2012, the Court approved FrankGecker's fees incurred in this chapter 11 case from April 2007 to July 2012. Main Case Docket nos. 436, 467. The Court also approved FrankGecker's request for a fee enhancement using a 2.0 lodestar multiplier. Main Case Docket no. 468.

-48-

been using in this litigation. AP Docket no. 57; AP Docket no. 59, Dec. Tittman, ¶22. What Continental pays its attorneys is not a relevant concern. See <u>Verbaere v. Life Investors Ins. Co. of America</u>, 226 Ill.App.3d 289, 300 (1992) (rejecting insurance company's argument that its attorneys' blended hourly rate should dictate the insured's attorney's hourly rate). Nevertheless, the Court notes that certain attorneys from Duane Morris have recently been employed by this Court as counsel to a chapter 11 trustee at hourly rates of $450 to $550. See Sullivan Vineyards, Ch. 11 Case no. 17-10065, Docket no. 201, Ex. A.

**B. Statutory Penalty**

Section 155 also provides, in relevant part, that the Court may award "an amount not to exceed" 60% of the amount which the court finds the party is entitled to recover against the insurance company, exclusive of all costs, or $60,000.

The Trustee advances a novel argument that the penalty available under §155 is not limited to the $60,000 in §155(b). Continental disagrees with the Trustee's position and points out that the language of §155 is clear: the Court is limited to awarding the lowest of the options. The Court is sympathetic to the Trustee's argument that on the facts of this case a $60,000 penalty is relatively meaningless but the Court is constrained by the language of the statute and the case law interpreting §155 which establishes that the penalty here is limited to $60,000. Accordingly, the Court will award the Trustee this amount.

**C. Prejudgment Interest**

The Trustee asks for prejudgment interest under the Illinois Interest Act (815 Ill.Comp. Stat. Ann. 205/2). The statute

-49-

provides in relevant part:

> §2. Creditors shall be allowed to receive at the rate of five (5) percentum per annum for all moneys after they become due on ... any instrument of writing ... and on money withheld by an unreasonable and vexatious delay of payment...

Prejudgment interest is available for sums due on insurance policies. Couch v. State Farm Ins. Co., 279 Ill.App.3d 1050, 1054 (1996) (insurance policy is written instrument, good faith defense to coverage did not preclude recovery of interest). The decision to award prejudgment interest is within the Court's discretion. Statewide Ins. Co. v. Houston Gen. Ins. Co., 397 Ill.App.3d 410, 425 (2009). In order for prejudgment interest to be awarded, the amount due must be liquidated or subject to easy determination. Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co., 611 F.3d 339, 355 (2010). Identifying at what point the loss becomes fixed or determinable for purposes of allowing prejudgment interest depends on the insurance policy itself and circumstances of each case. Chicago Bridge & Iron Co. v. Certain Underwriters at Lloyd's, London, 797 N.E.2d 434, 448 (2003) (applying Illinois law, prejudgment interest awarded for litigation expenses as of date action was filed and thereafter as subsequent litigation expenses were paid).

According to the Trustee, prejudgment interest on the $2.5 million in Policy limits is $202,371.96 through August 10, 2017 with a daily rate of $344.17 thereafter until entry of judgment. AP Docket no. 129, Dec. Chatz, ¶24. The Trustee calculated interest on the face amount of the first four Proposals of Tendered Claims sent between May 2015 and September 2015 which total the amount of the Continental Policy proceeds, starting

-50-

from the December 31, 2015 filing date of the Adversary Proceeding to August 10, 2017.

Based on the facts of this case, the Court exercises its discretion to award prejudgment interest of $202,371.96 plus $344.17 per day after August 10, 2017 until judgment is entered, as requested by the Trustee.

## IX. Conclusion

For the reasons explained above, the Court finds that Continental is liable under §155 for its vexatious and unreasonable conduct in this case. Within fourteen days of the date of entry of the Order on this Memorandum Decision, Continental must pay to the Trustee its Policy limits plus reasonable attorneys' fees, expenses, and prejudgment interest as explained above, plus a $60,000 penalty. A separate Order will follow.

**\*\* \*\* \*\* END OF MEMORANDUM DECISION \*\* \*\* \*\***

Case: 15-04136   Doc# 133   Filed: 11/15/17   Entered: 11/16/17 10:09:43   Page 51 of 51